Laura REARDON, Appellant

v.

**ALLEGHENY COLLEGE, Megan Reilly, Stacy Miller and Margaret Nelson, Appellees.**

Superior Court of Pennsylvania.

Argued April 11, 2007.

Filed June 1, 2007.

Timothy J. Codelka, Pittsburgh, for appellant.

Martha H. Munsch, Pittsburgh, for appellee.

BEFORE: ORIE MELVIN, BOWES and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Laura Reardon appeals from the August 15, 2006, Order dismissing her complaint with prejudice and sustaining appellees' preliminary objections in the nature of a demurrer.

¶ 2 The trial court found the following facts. *See* Trial Court Opinion, Folino, J., 10/4/06, at 1–2. Appellant was a student at Allegheny College (Allegheny) majoring in music with a minor in biology, having since graduated. During the spring semester of 2004, appellant, as part of her biology curriculum, enrolled in an investigative laboratory biology course taught by appellee Margaret Nelson. Professor Nelson assigned appellant, appellee Stacy Miller, and appellee Megan Reilly to work on a lab experiment as a group. Each student was required to submit an individual paper analyzing the results of the experiment upon completion.

¶ 3 When Professor Nelson viewed the class paper submissions, she immediately suspected plagiarism as appellant and Reilly's papers contained identical sections. Upon further reflection, Professor Nelson's suspicions pointed to appellant as the plagiarizer. Shortly thereafter, Allegheny's administration was notified of appellant's indiscretion.

¶ 4 The trial court concluded Allegheny faithfully adhered to its internal procedure in adjudicating the plagiarism charge. First, a panel of the Honors Committee was convened and it determined there was a reasonable likelihood that appellant had violated the Honor Code, thereby warrant-

ing further action. Next, the College Judicial Board (CJB) conducted a lengthy adjudicatory hearing wherein appellant was given the opportunity to present evidence and confront the witnesses offered against her. The CJB found appellant guilty of plagiarism and imposed a failing grade for the biology lab course; stripped appellant of her Latin Honors; ordered appellant to complete community service; and placed appellant on academic probation for the duration of her academic career at Allegheny. Appellant then was afforded the opportunity, as of right, to appeal to the school's President who affirmed the findings and disposition of the CJB.

¶ 5 On April 7, 2006, appellant filed a written complaint raising claims for breach of contract against Allegheny and, in a separate count, against Professor Nelson; claims for defamation against Allegheny and Professor Nelson and, in a separate count, defamation claims against both Miller and Reilly. She also pursued a claim for the intentional infliction of emotional distress against Allegheny, Professor Nelson, Miller, and Reilly. Record, No. 6. After appellees filed preliminary objections that were sustained, appellant filed an amended complaint raising, with more specificity, the claims that had been raised in the first complaint along with a newly pled negligence claim against both Allegheny and Professor Nelson. Appellee responded by demurring to all six counts contained in the amended complaint. Following dismissal of the amended complaint, appellant perfected a timely appeal with this Court in which she raises the following issues:

1. Did the Lower Court err when it determined that the Appellee College complied substantially with the requirement of providing a fair and impartial

judicial process and did not breach its contract with Appellant?

2. Did the Lower Court err when it determined that the Appellant failed to plead sufficient information to show that a third-party contractual relationship may exist, and that if one did, Appellant failed to sufficiently plead that such contract was breached?

3. Did the Lower Court err when it determined that the statements made by Appellees, under all of the circumstances, could not be construed as defamatory?

4. Did the Lower Court err when it determined that the Negligence claim was barred by the "Gist of the Action Doctrine" and that no other duties or obligations existed between the parties, under all of the circumstances?

5. Did the Lower Court err when it determined that the actions of all of the Appellees, under all of the circumstances, were not sufficient to support an action for Intentional Infliction of Emotional Distress?

Appellant's brief at 7.[1]

¶ 6 Our standard and scope of review over a trial court's decision to sustain a litigant's preliminary objections are well-settled:

> Our standard of review mandates that on an appeal from an order sustaining preliminary objections which would result in the dismissal of suit, we accept as true all well-pleaded material facts set forth in the Appellant['s] complaint and all reasonable inferences which may be drawn from those facts. This standard is equally applicable to our review of PO's in the nature of a demurrer. Where, as here, upholding sustained preliminary objections would result in

the dismissal of an action, we may do so only in cases that are clear and free from doubt. To be clear and free from doubt that dismissal is appropriate, it must appear with certainty that the law would not permit recovery by the plaintiff upon the facts averred. Any doubt should be resolved by a refusal to sustain the objections.

> We review for merit and correctness— that is to say, for an abuse of discretion or an error of law. This case was dismissed at the preliminary objections stage on issues of law; our scope of review is thus plenary.

*Donahue v. Federal Express Corp.*, 753 A.2d 238, 241 (Pa.Super.2000), quoting *Ellenbogen v. PNC Bank N.A.*, 731 A.2d 175, 181 (Pa.Super.1999).

¶ 7 Appellant contends Allegheny breached its contract with her by failing to follow its promised internal procedure for disposing of academic misconduct claims. She further contends Allegheny breached the contract by conducting the process in a "flawed, biased, and unfair" manner.

¶ 8 The relationship between a privately funded college and a student has traditionally been defined in this Commonwealth as strictly contractual in nature. *Barker v. Trustees of Bryn Mawr College*, 278 Pa. 121, 122, 122 A. 220, 221 (1923); *see also, Ross v. Pennsylvania State Univ.*, 445 F.Supp. 147, 152 (M.D.Pa.1978). As such, we review the agreement between the parties concerning disciplinary procedures, contained within a portion of the student handbook known as The Compass, as we would any other agreement between two private parties. *See Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 777 A.2d 418, 428 (2001).[2] "When a

---

1. We have inverted the order of appellant's final two issues for ease of disposition.

2. We recognize that *Murphy v. Duquesne University of the Holy Ghost*, 565 Pa. 571, 777

contract so specifies, generally applicable principles of contract law will suffice to insulate the institution's internal, private decisions from judicial review." *Id.* at 429.

¶ 9 Appellant does not contend the language of The Compass is ambiguous.[3] *See generally, Murphy, supra* at 429 ("When a writing is clear and unequivocal, its meaning must be determined by its contents alone."), *quoting Robert F. Felte, Inc. v. White,* 451 Pa. 137, 302 A.2d 347, 351 (1973) (additional citation omitted). Rather, she contends Allegheny breached its promised procedure by failing to notify her of a preliminary hearing held by the Honors Committee panel. Appellant's brief at 14, 21.

¶ 10 A thorough review of The Compass reveals the Honors Committee had an express obligation to inform appellant of the hearing that was held to determine whether there was a reasonable likelihood that she committed an Honors Code violation. Record, No. 12, Amended Complaint, Exb.

1, The Compass ("The Panel shall inform the accused student(s) of the time and place of the hearing."). Appellant avers she was not notified of an Honors Committee hearing held on September 1, 2004. Record, No. 12 at 8. Appellee contends appellant was given notice of, and indeed did attend, an Honors Committee hearing held on May 1, 2004. Appellees' brief at 14 n. 7. Appellee further states the September 1, 2004, hearing pertained to the plagiarism allegations leveled against *Miller and Reilly* and, as such, appellant was not entitled to attend that meeting. *Id.* at 15.

¶ 11 A thorough review of appellant's amended complaint reveals appellant acknowledges a hearing did take place on May 1, 2004. Record, No. 12 at 8. In a not so creative attempt at subterfuge, appellant contends over and over again that she was not informed of the September 1, 2004, hearing, *yet she never once states she did not receive notice of the May 1, 2004 hearing.*[4] The terms of The Compass do

A.2d 418 (2001), can be distinguished from the matter *sub judice* for two reasons. First, *Murphy* was a contract action based on the allegation that Duquesne breached its employment contract with one of its professors. Second, *Murphy* was at the summary judgment stage when decided.

Despite these distinctions, we believe that the central premise of *Murphy*, providing that breach of contract actions brought by a party against a private college or learning institution should be treated as any other contract, should be adhered to. Consequently, appellant's attempts to invoke due process concerns and questions of fundamental fairness are misplaced as our review is not guided by due process concerns. *Cf. Boehm v. Univ. of Pennsylvania School of Veterinary Medicine,* 392 Pa.Super. 502, 573 A.2d 575, 580 (1990) (discussing the fact that some courts have reviewed private colleges' disciplinary procedures by considering whether they comport with the minimum guarantees of due process); *see contra, Murphy, supra* at 428 ("Upon careful reflection, we can discern no principled basis for reviewing a breach of contract action that involves private conduct

according to principles that arise out of the Fourteenth Amendment, and which govern state action.").

We will, therefore, review appellant's claim that Allegheny breached the promises contained in The Compass as we would any other breach of contract claim dismissed on demurrer.

3. Appellant's breach of contract action is based on the premise that The Compass memorializes the terms of the contract between herself and Allegheny. Appellant does not raise any argument on the issue of whether these terms were bargained for or whether she was aware of the terms contained within The Compass before enrolling at Allegheny. When this fact is coupled with the fact that appellant does not allege The Compass is ambiguous, it becomes apparent that appellant is asking us to review The Compass by reading it strictly.

4. Appellant asserts Allegheny, in allegedly failing to notify her of the Honors Committee hearing, violated Article III(1)(D) of The Com-

not give an accused student the right to attend a preliminary hearing held by the Honors Committee pertaining to charges leveled at a *co-defendant*, irrespective of the nature of the testimony and evidence to be offered at such a hearing. *See* Record, No. 12, Exb. 1. Furthermore, there is nothing in The Compass stating that a defendant is entitled to more than one preliminary hearing—the pertinent provisions unambiguously states the Honors Committee is required to hold "a" hearing. *Id.*

¶ 12 Appellant also attacks the actual proceedings themselves by forwarding a laundry list of complaints, wherein she contends Allegheny breached The Compass procedures in the following manner: 1) allowing attendance at various meetings by people who should have not attended; 2) allowing prejudicial and biased statements to be made by Professor Nelson prior to the CJB hearing; 3) failing to conduct an impartial hearing by allowing various members of the CJB to make unsupported statements; 4) allowing a committee member to improperly provide assistance to a witness against Reardon; 5) allowing confidential information about the ultimate outcome of the proceedings to be leaked to the college community; and 6) by failing to retrieve potentially exculpatory evidence from appellant's student computing account.

¶ 13 Assuming, as we must, that all of these contentions, as laid out in appellant's amended complaint, are true, we still conclude appellant is not entitled to relief. The Compass provides for minimum procedural safeguards—notice, the admission of relevant testimony, the right to call witnesses and present evidence, and the right to be represented by a member of the college community. The Compass does not contain complicated procedural or evidentiary rules that address the specific concerns appellant raises—attendance at the CJB hearing, the admission of prejudicial statements at the CJB hearing, the behavior of the CJB tribunal, protection against the dissemination of the opinions of CJB tribunal members, or the College's duty to obtain and share evidence. Our review of the record indicates appellant was afforded the rights promised to her in The Compass. That is all that was required. *Murphy, supra* at 429.

¶ 14 The parties' agreement, embodied in The Compass, provides: "The decision of the President is final." Record, No. 12, Exb. 1. This clause is adequate to insulate the merits of Allegheny's decision from intensive review, inasmuch as the unambiguous terms of The Compass were not breached. *Murphy, supra* at 429.[5]

¶ 15 We conclude the trial court properly dismissed appellant's breach of contract

---

pass. The provision, however, deals with students that have taken a leave of absence and have committed crimes in society at large before re-enrolling.

There is only one reason appellant's invocation of this provision has any relevance. It shows appellant was on a leave of absence when the September 1, 2004, hearing was held. *See also*, appellant's brief at 14. Appellant, therefore, is attempting to persuade this Court, albeit by manipulating the facts of record, that Allegheny commenced its disciplinary procedure when appellant was on a leave of absence.

We find it inconceivable that Allegheny would construct such an elaborate conspiracy only to allow appellant to continue her studies without interruption so she could graduate.

5. A distinction must be made between the allegation that Allegheny breached the terms of The Compass by failing to adhere to its provisions, which is a reviewable claim, and the allegation that the way in which these provisions were implemented, or the outcome arrived at by such implementation, was unfair—a claim which is *not* reviewable according to the provisions of The Compass. *See Murphy, supra* at 429.

claim against Allegheny College. Appellant does not contend The Compass is ambiguous. She is unable to contend Allegheny breached any of the terms contained in The Compass. Thus, she is merely asking us to review the "private, internal decisions" of the College—something that is forbidden by the terms of both The Compass and case law. *Murphy, supra* at 429. The trial court correctly dismissed this claim on legal grounds. *See Donahue, supra* at 241.

¶ 16 Appellant's next issue challenges the trial court's disposition of her breach of contract claim against Professor Nelson. Appellant contends that as a student she was an intended third-party beneficiary of any existing employment contract between Professor Nelson and Allegheny. Appellant argues that Professor Nelson, as part of her employment contract with Allegheny, "failed to follow and/or uphold the college policies and procedures by unfairly biasing the judicial process against the Plaintiff and disrupting the requirement of a fair and impartial hearing." *Id.*

¶ 17 For the sake of argument, we will accept appellant's assertion that she was a third-party beneficiary of any existing employment contract. *But see contra, Burks v. Fed. Ins. Co.,* 883 A.2d 1086, 1088 (Pa.Super.2005) ("In order for a third party beneficiary to have standing to recover on a contract, both contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must affirmatively appeared in the contract itself.") (citation omitted).[6] We will also assume, *arguendo*, that appellant is correct in contending that any existing employment contract required Professor Nelson to "follow and/or uphold the college policies and procedures." Record, No. 12 at 18. Even with the support of these assumptions, however, appellant's claim must fail because appellant fails to plead how Professor Nelson corrupted The Compass disciplinary procedure "by unfairly biasing the judicial process against the Plaintiff and disrupting the requirement of a fair and impartial hearing." *Id.* Appellant suggests Professor Nelson biased the disciplinary process by accusing appellant of plagiarism in the first instance and providing first hand knowledge in supporting the accusation.

¶ 18 This suggestion is problematic.[7] Essentially, appellant is attempting to get around the fact that Allegheny adhered to its disciplinary procedures and performed its obligations as outlined in The Compass by suggesting Professor Nelson was able to use her influence to make the proceedings "unfair." We will not permit appellant to use vague and unsubstantiated allegations of "unfairness" to transcend the application of well-settled contract law, which prohibits us from reaching the merits of Allegheny's "private, internal decisions" once it has been determined there has been adherence to the literal terms of the contract. *Murphy, supra* at 429. Giv-

6. We accept appellant's contention because we recognize the procedural posture of this case requires us to resolve all doubts in favor of the party whose claim was dismissed by the lower court. *Donahue, supra* at 241. Appellant contends that because she is unable to gain access to any existing employment contract between Allegheny College and Professor Nelson, it is impossible for her to demonstrate she was a third-party beneficiary of the contract.

7. Appellant is basically saying that The Compass disciplinary procedure is superfluous—that once Professor Nelson accused appellant, discipline was certain to follow. In order to accept such a contention, we would also have to believe that the Hearing Committee, CJB, and President allowed themselves to be biased. There is absolutely no evidence of record demonstrating such was the case.

en the unambiguous language in The Compass, the trial court correctly dismissed this claim. *See Donahue, supra* at 241.

¶ 19 As to appellant's defamation claims against Allegheny, Professor Nelson, Miller, and Reilly, a plaintiff seeking to establish a claim for defamation and, more specifically, for slander has the burden of proving: 1) the defamatory nature of the alleged communication(s);[8] 2) the publication of the communication(s) by the defendant; 3) the application of the communication to the plaintiff; 4) the recipient's understanding of the communication's meaning; 5) the recipient's understanding that the communication is intended to be applied to the plaintiff; 6) special harm resulting to the plaintiff; and, 7) abuse of a conditionally privileged occasion. 42 Pa. C.S.A. § 8343, **Burden of Proof,** (a) **Burden of plaintiff.**

¶ 20 The initial determination of whether a communication is slanderous is a question of law for the Court to decide. *Walker v. Grand Central Sanitation,* 430 Pa.Super. 236, 634 A.2d 237, 240 (1993). A communication is slanderous if it is intended to lower the view of the target of the communication in the community or if it is intended to deter third persons from associating with the target. In determining whether a communication is slanderous, the Court must determine the effect of the communication in the minds of average people amongst whom the communication is intended to circulate. A statement that is merely an expression of an opinion, however, cannot constitute slander. *Id.*

¶ 21 Appellant points to four statements, allegedly made by Professor Nelson, in attempting to demonstrate slander. The first is a statement allegedly made by Professor Nelson to Mary Zoller, chair of the Honor Committee panel, a panel of students who hear suspected violations of the Honor Code, wherein the professor stated: "I now highly suspect that both [Miller] and [Reilly] are innocent." Record, No. 12 at 7. This statement is nothing more than an opinion and, as such, cannot constitute slander as a matter of law. *Walker, supra* at 240.

¶ 22 Next, appellant points to another statement allegedly made by Professor Nelson to Chairperson Zoller: "[C]oupled with the fact that she's now got 'clones' of two other students' reports in there, it seems rather suggestive to me." Record, No. 12 at 19. Again, this is a clear expression of opinion that is not actionable as a matter of law.

¶ 23 The third statement upon which appellant relies, again allegedly made by Professor Nelson to Zoller, is as follows: "[I]t didn't really occur to me that someone might have snitched work from two other students." Record, No. 12 at 7. The use of the phrase "might have" is a strong indication that this statement is merely one outlining possibilities—it was not intended to attack appellant's reputation in the community. *Walker, supra* at 240. As such, this statement also is not actionable slander.

¶ 24 Appellant points to one final statement, wherein Professor Nelson allegedly told Honor Committee members that sections of appellant's lab paper "matched" sections of appellee Miller and appellee Reilly's papers. Record, No. 12 at 8. The intent of this statement, however, was not to impugn appellant's character but, rather, to impart the factual basis upon which Professor Nelson was forwarding her opin-

---

8. A necessary element of a defamatory communication is that it is false. **Black's Law** **Dictionary** (8th ed.2004).

ion regarding who plagiarized whom—a factual basis which was later proven to be true. *Walker, supra* at 240. Appellant, for her part, does not dispute that sections of the papers matched—rather, she implies that it was Miller and Reilly who were the plagiarizers. Consequently, this statement is not actionable because it clearly lacks slanderous intent and is factual in nature. *Id., accord* 42 Pa.C.S.A. § 8343, *supra.*

■ ¶ 25 Appellant also contends appellee Reilly gave a slanderous statement to the Honors Committee panel when she told them appellant had told Miller that appellant "turned [in] her R & D late," apparently referring to an earlier written project in Professor Nelson's biology class. Record, No. 12 at 21.[9] This snippet of a statement, however, is clearly insufficient to establish slander. We simply have no indication that the statement was intended to impugn appellant's reputation in the community, nor does appellant aver as much. *Walker, supra* at 240. It is also impossible to imagine that Miller's alleged statement would have an adverse effect on any person hearing it in a college environment, where students often miss deadlines, hand in projects late, and negotiate for extensions.

¶ 26 Appellant also contends Reilly gave a slanderous statement to the Honor Committee panel when she said appellant "came and told class that she was still drunk." Record, No. 12 at 8. College students drinking before class or coming to class hung over, as untoward as it may be, is not something that would rise to the level of defamatory in the mind of the average college student. *See Walker, supra* at 240. Thus, it is difficult to imagine

that one student, intimately familiar with the college social landscape, would intend for this statement to cause damage to appellant's reputation.

¶ 27 In the end analysis, appellant's claims of slander are based on alleged statements that are either opinions, factual in nature, and/or non-slanderous in intent. Not a single statement to which she points would afford her recovery even if proven. There is no doubt the trial court correctly dismissed appellant's slander claims. *Donahue, supra* at 241.

¶ 28 Appellant also alleges the lower court erred when it determined her negligence claim was barred by the "gist of the action doctrine" and that no other duties or obligations existed between the parties. Appellant's brief at 33.

¶ 29 In her amended complaint at count VI, appellant contends Allegheny and Professor Nelson were negligent in conducting the disciplinary process and failing to obtain allegedly exculpatory computer data in their control. Record, No. 12 at 24.

¶ 30 The trial court dismissed appellant's negligence claim by relying on the "gist of the action doctrine," which allows a court to dismiss a negligence claim that is nothing more then a re-characterized contract claim. Appellant asserts our Supreme Court has not yet adopted this doctrine and, therefore, sufficient doubt exists as to the validity of her negligence claim to allow the claim to proceed. We disagree.

¶ 31 While an intensive research effort does indicate that our Supreme Court has not explicitly reviewed the concept under the appellation "gist of the action," dicta from the Court indicates it recognizes that

---

9. As noted above, appellant complains she was not given notice of the September 1, 2004, Honors Committee panel hearing and, therefore, was unable to attend. How then does she know what was said during the hearing? No transcripts were made part of the certified record in this case. We have no way of knowing, therefore, whether Miller and Reilly actually gave the statements appellant ascribes to them.

allowing plaintiffs to forward both tortious and contractual theories of recovery arising out of damages allegedly incurred in the context of a contractual relationship is problematic. Over 40 years ago the Court stated:

To permit a promisee to sue his promissor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions. Most courts have been cautious about permitting tort recovery for contractual breaches and we are in full accord with this policy. *See* Developments in the Law—Competitive Torts, 77 Harv. L.Rev. 888, 968 (1964). The methods of proof and the damages recoverable in actions for breach of contract are well established and need not be embellished by new procedures or new concepts which might tend to confuse both the bar and litigants.

*Glazer v. Chandler,* 414 Pa. 304, 200 A.2d 416, 418 (1964). Thereafter, both this Court and various federal courts have operated under the assumption that the gist

of the action doctrine is a viable doctrine that will eventually be explicitly adopted by our state's High Court.[10] The Supreme Court is clearly aware of the frequent use of this doctrine by both the lower and federal courts of this state, but has declined at least three opportunities to put an end to its use.[11] As a consequence, we consider the gist of the action doctrine to be viable.

¶ 32 The gist of the action doctrine acts to foreclose tort claims: 1) arising solely from the contractual relationship between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; and 4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim. *Hart v. Arnold,* 884 A.2d 316, 340 (Pa.Super.2005), citing *eToll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 19 (Pa.Super.2002). The critical conceptual distinction between a breach of contract claim and a tort claim is that the former arises out of "breaches

---

**10.** *See e.g., Reed v. Dupuis,* 920 A.2d 861 (Pa.Super.2007); *eToll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 14 (Pa.Super.2002); *Redevelopment Auth. of Cambria County v. Int'l Ins. Co.,* 454 Pa.Super. 374, 685 A.2d 581, 590 (1996) *(en banc), allocatur withdrawn as improvidently granted* 544 Pa. 345, 676 A.2d 237 (1996); *Phico Ins. Co. v. Presbyterian Med. Servs. Corp.,* 444 Pa.Super. 221, 663 A.2d 753, 756–757 (1995); *Bash v. Bell Tel. Co.,* 411 Pa.Super. 347, 601 A.2d 825, 829 (1992); *Hirsch v. Mt. Carmel Dist. Indus. Fund, Inc.,* 363 Pa.Super. 433, 526 A.2d 422, 423 (1987); *Raab v. Keystone Ins. Co.,* 271 Pa.Super. 185, 412 A.2d 638, 639 (1979), *allocatur withdrawn as improvidently granted* 496 Pa. 414, 437 A.2d 941 (1981); *see also, Werwinski v. Ford Motor Co.,* 286 F.3d 661, 680 (3d Cir.2002); *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 103 (3d Cir.2001).

**11.** *Yocca v. Pittsburgh Steelers Sports, Inc.,* 578 Pa. 479, 854 A.2d 425, 433 (2004) (af-

firming a trial court's decision to dismiss purportedly quasitortious claims brought under the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 et. seq. on alternate grounds without expressly stating as much and noting that the trial court relied on the gist of the action doctrine in originally dismissing said claims); *Hart v. Arnold,* 884 A.2d 316, 339 (Pa.Super.2005) (affirming the dismissal of a fraud in the performance claim as collateral to the main cause of action alleging breach of contract), *allocatur denied* 587 Pa. 695, 897 A.2d 458 (2006); *Pittsburgh Constr. Co. v. Griffith,* 834 A.2d 572, 584 (Pa.Super.2003) (reversing a trial court's decision to submit a tortuous conversion claim to the jury when the claim arose out of a contractual relationship, the breach of which gave rise to the primary cause of action), *allocatur denied* 578 Pa. 701, 852 A.2d 313 (2004).

of duties imposed by mutual consensus agreements between particular individuals," while the latter arises out of "breaches of duties imposed by law as a matter of social policy." *Hart* at 339, *quoting Pittsburgh Constr. Co. v. Griffith,* 834 A.2d 572, 581–582 (Pa.Super.2003), *allocatur denied* 578 Pa. 701, 852 A.2d 313 (2004).

¶ 33 It is axiomatic that a plaintiff must establish he or she was owed a duty of care by the defendant, the defendant breached this duty, and this breach resulted in injury and actual loss in order to successfully prove negligence. *McCandless v. Edwards,* 908 A.2d 900, 903 (Pa.Super.2006).

¶ 34 Appellant's charges of negligence are premised on the concept that Allegheny and Professor Nelson owed appellant, "as a member of the college community," duties that are "in addition to and apart from any contractual obligation raised." Record, No. 12 at 23–24.

¶ 35 The problem with this concept is that appellant fails to plead from where this duty arises or what this duty entails. The only duties owed by Allegheny and Professor Nelson we can discern are rooted in The Compass—not some external and undefined general duty of care. *See McCandless, supra* at 903–904; *see also, Hart, supra* at 340. Indeed, The Compass represents the sole basis for the relationship between the parties—appellant promises to adhere to the Honor Code in exchange for an education at Allegheny, while Allegheny, and to a lesser degree Professor Nelson, promises to adhere to the terms of The Compass in giving this education in exchange for monetary compensation. If this context were stripped away, there would be no relationship between the parties. Any potential liability Allegheny and Professor Nelson could incur, therefore, would arise out of their breach of the terms set forth in The Compass. Furthermore, if appellant is unable to demonstrate The Compass was breached, it is impossible to discern any other source from which liability could flow. *See, supra* at 340.

¶ 36 We find that the trial court correctly applied the gist of the action doctrine in dismissing appellant's negligence claim as legally defective. *Hart, supra* at 341.

¶ 37 Finally, appellant maintains the trial court erred when it determined the actions of appellees, under all of the circumstances, were not sufficient to support an action for intentional infliction of emotional distress (IIED).

¶ 38 For purposes of disposing of this claim we must assume that a tort for the intentional infliction of emotional distress exists in the Commonwealth.[12] Our Su-

---

**12.** The law on this matter is unsettled. In *Taylor v. Albert Einstein Medical Center,* 562 Pa. 176, 183–184, 754 A.2d 650, 653 (2000), Chief Justice Flaherty, wrote the "Opinion Announcing the Judgment of the Court" and noted, "we have never expressly recognized a cause of action for intentional infliction of emotional distress, and thus have never formally adopted this section of the Restatement, we have cited the section as setting forth the minimum elements necessary to sustain such a cause of action." *Citing Kazatsky v. King David Mem'l Park,* 515 Pa. 183, 527 A.2d 988, 995 (1987). *Accord Hoy v. Angelone,* 554 Pa. 134, 151 n. 10, 720 A.2d 745, 753 n. 10 (1998); *Johnson v. Caparelli,* 425 Pa.Super. 404, 625 A.2d 668, 671–673 (1993), *allocatur denied* 538 Pa. 635, 647 A.2d 511 (1994).

Justice Castille, in a Concurring Opinion joined by Justice Nigro, took issue with the broad proposition that our Supreme Court had never recognized a cause of action for emotional distress. *Taylor,* at 653–654 *citing Papieves v. Kelly,* 437 Pa. 373, 263 A.2d 118 (1970). Justice Castille found *Papieves* readily distinguishable however in that it involved the mistreatment of a corpse.

Whatever the Supreme Court eventually decides in this matter, we conclude that when an intentional infliction of emotional distress

preme Court, also assuming for purposes of analysis that an IIED tort exists in Pennsylvania, stated that in order for a plaintiff to recover:

> [T]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in any civilized society ... [I]t has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.

*Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745, 753–754 (1998) (internal citation omitted), quoting in part **Restatement (Second) of Torts § 46, Outrageous Conduct Causing Severe Emotional Distress,** cmt. d; *Daughen v. Fox,* 372 Pa.Super. 405, 539 A.2d 858, 861 (1988).

¶ 39 Appellant's amended complaint demonstrates that the crux of her IIED claim is based on the premise that appellees "intentionally and wrongly targeted and accused [appellant] of violations of the college's honor code," despite their knowledge of the falsity of these allegations, and that Allegheny and Professor Nelson acted to deprive appellant of her "rights to a fair and impartial hearing." Record, No. 12 at 22–23.

¶ 40 Appellant's allegations, even if accepted as true, do not rise to a level that could be described as "clearly desperate and ultra extreme conduct." *Hoy, supra* at 754. With respect to Miller and Reilly, appellant contends the statements they al-

legedly gave to the Honors Committee, analyzed in detail above, comprised the type of conduct that would afford relief. Yet, if these statements were not even slanderous, it is difficult to see how they could be defined as "ultra extreme."

¶ 41 Similarly, Allegheny and Professor Nelson adhered to their contractual duties under The Compass, which provided the parameters for the relationship between the parties. While we are required to accept as true all "well-pleaded" facts given the procedural posture of this case, the allegation above is not a well-pleaded fact—it is a bald and unsubstantiated legal allegation that is unsupported by any averment that either Allegheny or Professor Nelson breached their contractual obligations to appellant. *Donahue, supra* at 241. The trial court, therefore, properly dismissed the claim. *Id.*

¶ 42 As appellant's amended complaint did not furnish any legally cognizable grounds for recovery, we conclude the trial court properly dismissed appellant's claims. *Donahue, supra* at 241.

¶ 43 Order affirmed.

---

claim is dismissed upon demurrer, the appropriate legal standard to be applied in reviewing the claim is whether the complaint sufficiently pleads the claim in a manner that

corresponds, "at a minimum," with the provisions of the Restatement (Second) of Torts, § 46(1), **Outrageous Conduct Causing Severe Emotional Distress.**