**Henry v. PNC Bank, N.A.**

*James M. Pietz,* for representative class and plaintiff
*Darryl J. May, Mariah M. Murphy* and *Marcel S. Pratt,*
for defendant

WETTICK, *J.,* July 8, 2013—The preliminary

objections of PNC Bank seeking dismissal of each of the six counts within plaintiff's amended class action complaint are the subject of this opinion and order of court.

Plaintiff, Candace H. Henry, is a former customer of PNC who was provided with a checking account and debit card. She alleges that she was the victim of a practice in which PNC maximized overdraft charges (1) by waiting until the end of a business day to determine whether the account balance in a customer's checking account was sufficient to cover all debit transactions from the end of the prior business day to the end of the current business day and (2) by using a high-to-low posting where there were multiple transactions within this period thereby maximizing the overdraft fees whenever the total charges against the account at the end of the business day exceeded the account balance.[1]

EXAMPLE: The balance of the customer's checking account as of 12:01 A.M. on Wednesday is $3,000; debit card transaction 1 at 7:00 A.M.-$7.27; transaction 2 at 8:15 A.M.-$4.21; transaction 3 at 12:37 P.M.-$21.16; Transaction 4 at 1:01 P.M.-$3.13; transaction 5-$2,989.00 at 3:30 P.M. (payment of tuition).

If the account was posted in chronological order, the customer would be charged for one overdraft. If the account was posted from lowers to highest at the end of the business day, the customer would be charged for

---

1. Plaintiff alleges that a $36.00 fee is charged for each and every transaction that results in an overdraft for up to four overdrafts per day.

one overdraft. However, if the account was posted from highest to lowest at the end of the business day, the customer would be charged for four overdrafts. Under this third scenario, PNC would be assessing overdraft charges on four transactions for which the actual funds in the customer's account were sufficient at the time of each transaction to cover the debits submitted for payment.

The situation is exacerbated when numerous debit card transactions occur on Saturday through Monday. PNC treats this three-day period as one business day. Consequently, if the total transaction amount for this three-day period exceeds the balance of the account as of 11:59 P.M. on Monday, the number of defaults will be based on the posting of all debits submitted over the three-day period in highest to lowest order.

In plaintiff's first amended class action complaint, plaintiff describes three overdraft incidents:

Incident 1-At the close of business on May 19, 2010, plaintiff had an account balance of $160.34. On May 20, 2010, PNC posted three charges to plaintiff's account: a check for $160.00 and two debit card transactions, one for $8.05 and the other for $5.93. PNC approved the two debit card transactions before it received the check. However, at the end of the business day, PNC posted the check for $160 before posting the $8.05 and $5.93 debits. The result was that plaintiff's account was charged overdraft fees totaling $72.00 for $13.98 in overdrafts. If PNC had deducted the debit charges when it received notice of them and in chronological order, plaintiff would have been

charged only one overdraft fee when the $160.00 check was posted (¶¶39-41, plaintiff's amended complaint).

Incident 2-At the end of the day on May 20, 2010, plaintiff had a balance of-$13.64 in her checking account. However, in the early hours of May 21, 2010, PNC received a direct deposit into plaintiff's account in the amount of $641.55. It received that money before the opening of the business day on May 21, 2010. Had her account been credited with those funds at the time PNC received them, the account balance would have been $627.91 before any additional transactions could be posted to her account. However, PNC deducted a debit card transaction before crediting plaintiff's account for the direct deposit, resulting in another overdraft fee (¶42, plaintiff's amended complaint).

Incident 3-On June 11, 2010, plaintiff began the day with a balance of $84.23. During the day, she deposited $320.00 in her account resulting in over $400.00 in available funds in the account on that date. However, plaintiff incurred four overdraft fees totaling $144.00 on $336.68 in total charges. But for PNC's resequencing and delayed deposits policies, plaintiff would have incurred fewer or no overdraft fees on that day (¶43, plaintiff's amended complaint).

Each of the counts in plaintiff's six-count complaint is based, wholly or partially, on PNC's practice of posting all debit transactions only at the end of the business day and processing them from the highest to lowest amount, thereby maximizing the number of overdraft fees charged

to the customer.

I now consider PNC's preliminary objections to each of plaintiff's six causes of action.

## I. BREACH OF CONTRACT AND THE DUTY OF GOOD FAITH AND FAIR DEALINGS

I initially begin with plaintiff's third cause of action based on allegations that PNC has breached its contractual obligations to plaintiff by posting debits only at the end of the business day in high-to-low order.

PNC contends that this cause of action must be dismissed because plaintiff executed writings which authorized the posting of all debit transactions at the end of a business day, using a high-to-low posting sequence. In support of this contention, PNC primarily relies on three writings, herein designated as writings A, B, and C.

### WRITING A

PNC relies on the first page of the twenty-seven-page, single-spaced (and not indexed) account agreement for personal checking, savings and money market accounts ("account agreement"), exhibit 1 to plaintiff's amended complaint, which directs the customer to refer to the following:

You should also refer to certain other documents for terms and conditions relating to your Account, including PNC Bank's:

(i) Consumer Schedule of Service Charges and Fees;

(ii) Funds Availability Policy;

(iii) Substitute Check Policy Disclosure;

(iv) Consumer Electronic Funds Transfer Disclosure Statement; and,

(v) PNC Bank Online Banking and Bill Pay, Online Banking Transfer Funds and PNC Payment Services, and/or Online Bill Pay Services Agreement for Information concerning the use of these services (if you have selected any of these services);

(vi) Overdraft Protection Agreement; and

(vii) The PNC Financial Services Group, Inc. Consumer Information Privacy Principles.

## WRITING B

PNC relies on the following three paragraphs of the account agreement at pages 3 and 4 under the heading *withdrawals*:

## Paragraph 3

Your account may be debited on the day an item is presented by electronic or other means, or at an earlier time based on notification received by us that an item drawn on your account has been deposited for collection in another financial institution. We are required to permit a withdrawal only if you have sufficient available funds in your Account to cover the whole amount of the withdrawal. A determination of your account balance

for purposes of making a decision to dishonor an item for insufficiency of available funds may be made at any time between the receipt of such presentment or notice and the time of payment of return of the item or debit, and no more than one such determination need be made.

## Paragraph 4

Effective September 19, 2008, in determining whether you have sufficient funds in your account to cover a withdrawal. PNC Bank will consider: (1) the deposits and withdrawals posted that day to your account, and (2) all pending electronic transactions for which PNC has received notice, even if those transactions have not been presented to PNC for payment Such transactions include (but are not limited to) purchases, transfers or withdrawals made with your Check Card or Banking Card, merchant payment authorizations, online transfers of funds, telephone transfers, and any other electronic transactions or transfers. We may conclusively rely on notice of electronic transactions in determining whether you have sufficient funds in your account to cover a withdrawal even if the notice incorrectly describes the transaction. This could result in an overdraft if sufficient funds are not available in your account to cover all withdrawals. We will not be responsible for damages or wrongful dishonor if any item is not paid because of insufficient funds resulting from this method of determining whether you have sufficient funds to cover a withdrawal. In addition, funds you may have

deposited may not be immediately available under our Funds Availability Policy. Please review our Funds Availability Policy for more information.

Paragraph 5

Checks, debits such as ATM withdrawals, debit card transactions, preauthorized automatic debits, telephone-initiated transfers, other electronic transfers, other types of debits or other withdrawal orders that exceed the available balance in your account (that create an overdraft) are subject to a service charge. If there are sufficient funds to cover some but not all of your withdrawal orders, we will exercise our discretion (i) in paying some but not all of the items, and (II) to pay the items in any order. In exercising that discretion to pay in any order, we do not necessarily process items in the order in which we receive them. Our general Practice is to Post withdrawals from your account in order of the largest-to-smallest dollar item: in other words, beginning with the largest dollar item, then the next-largest dollar item., and so on until we reach the last, smallest-dollar item. The order in which we process these withdrawals may affect the total amount of overdraft fees charged to your Account. If, in our sole discretion, we choose to allow withdrawals for which there are not sufficient available funds, you agree to replay us immediately the amount of the funds advanced to you. We may also assess your Account a service charge. At no time shall we be required to allow you to overdraw your Account even if we have

allowed such activity on one or more prior occasions. We reserve the right to refuse to cash or to impose a charge on anyone who asks us to cash a check that you have written. Even if your check is otherwise properly payable, we will not be liable to you for dishonor of your check, or otherwise, as a result of such refusal.

(The court's underlining.)

## WRITING C

PNC refers to page 1 of the Consumer Funds Availability Policy, which reads under the heading *Determining Availability of a Deposit* as follows:

Determining Availability of a Deposit

We determine availability by counting the number of business days from the business day of your deposit. Every day except Saturday, Sunday and a federal holiday is a business day.

If you make a deposit through one of our branch tellers, ATM, or by mail before our cut-off time, we will consider that day to be the day of your deposit. However, if you make a deposit after our cut-off time or on a day that is not a business day, we will consider the deposit as being made on the next business day that we are open. Our cut-off time for branches will not be earlier than 2:00 p.m., but may vary by branch. The cut-off time for PNC Bank ATMS will be no earlier than 12:00 Noon, but may vary by location. The cut-off time for non-PNC Bank ATMs is 3:00 p.m. Deposits

made through our night depository after 6:00 a.m. may be processed on the next business day.

Availability varies depending on the type of deposit and is explained below.

Checks drawn on banks located outside of the United States are not subject to this availability Policy. Please inquire regarding availability at the time you make such deposits.

PNC's supplemental memorandum, Ex. F at 1.

PNC primarily relies on the underlined provisions in the fifth paragraph of writing B under *Withdrawals*, which states that debits exceeding the available balance in the account are subject to a service charge. If there are sufficient funds to cover some but not all of the withdrawal orders, it is the general practice of PNC to post withdrawals in order of the largest-to-smallest dollar "item." The order in which PNC processes these withdrawals may affect the total amount of overdraft fees.

This provision does not authorize PNC to post withdrawals only at the end of the day; it never mentions when withdrawals will be posted. Thus, even assuming that a customer can find his or her way to paragraph 5 under *Withdrawals* of the account agreement, this paragraph does not say when PNC processes withdrawals. If the customer purchases with a debit card two items totaling $37.10 and $11.56 at a time when the customer has $300.00 in his or her checking account, nothing in paragraph 5 suggests that these purchases will not be posted until the end of the

business day (which would be the end of Monday for debit card purchases made on Saturday, Sunday, and Monday).

PNC also relies on the underlined provisions in paragraph 4 of writing B. However, nothing in this writing suggests that transactions will not be posted until the end of a business day.

Even assuming that paragraphs 3 through 5 could be read to provide for deposits and withdrawals to be posted at the end of the day, nothing within paragraphs 3 through 5 suggests that a day means a business day. I find no merit to PNC's contentions that the customer was informed that a day means a business day because writing A refers the customer to a document titled *Funds Availability Policy,* and writing C, the first page of the Consumer Funds Availability Policy, advises the customer that the term day means business day.

The heading of this provision is *Determining Availability of a Deposit,* thus, no customer would look to this provision for information about overdraft fees. Furthermore, this provision covers only the availability of deposited funds.

PNC argues that this provision's reference to a definition of a *business day* should be used in defining the term *day* in paragraphs 3 and 4 of writing B. This makes no sense because there is nothing to suggest that there is a connection between the provisions in a writing titled *Funds Availability Policy* and the provisions in a writing titled *Account Agreement* governing overdraft

policies. Furthermore, since the use of the term business *day* refers to every day except Saturday, Sunday, and a federal holiday, the use of the term *day* elsewhere suggests that PNC is not referring to a business day when it uses the term *day*.

Plaintiff is not claiming that she did not know that overdraft fees would be charged if her debits exceeded the amount of funds in her checking account However, she correctly contends that she never knew of, and never agreed to, PNC's use of any specific method for calculating overdraft fees because, as I have already ruled, (1) the Account Agreement does not adequately explain that PNC would post all debit transactions at the end of a business day, using a high-to-low posting sequence and (2) PNC does not claim that the account agreement describes any other method of calculating overdraft fees.

Every contract imposes upon each party a duty of good faith and fair dealing in its performance. *John B. Conomos, Inc. v. Sun Co., Inc.,* 831 A.2d 696, 705-06 (Pa. Super. 2003). There is no breach of this implied covenant where a party to a contract has done what the provisions of the contract expressly give it the right to do. However, where, as in this case, the manner of performance is not specifically prescribed. a party exercising its discretion is subject to an implied obligation of good faith and fair dealing.

In the present case, the agreement between PNC and plaintiff does not expressly permit PNC to impose overdraft fees by posting all debits at the end of a business

day, using a high-to-low posting. Furthermore, this is not the only method for imposing overdraft fees that would have been available to PNC. Consequently, plaintiff may base a breach of contract action on allegations that PNC's use of this method of calculating overdraft fees constituted a breach of the implied covenant of fair dealing and good faith.

## SUMMARY

Where an agreement between the bank and the customer authorizes the bank to impose overdraft fees and where the agreement does not fully explain to the customer how such fees will be imposed, the bank's selection of a method for imposing overdraft fees is governed by the obligations imposed under the implied covenant of fair dealing and good faith. As with any other express or implied covenant, the implied covenant of fair dealing and good faith may be enforced through a breach of contract action.

## II. VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

In count I, plaintiff alleges that PNC's practice of posting all debit transactions at the end of a business day, using a high-to-low posting, constitutes a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Consumer Protection Law"), 73 P.S. §§201-1 et seq. In its preliminary objections, PNC seeks dismissal on two grounds: it contends (1) the disclosures set forth at pages 4-7 of this Opinion undermine any

claim under the Consumer. Protection Law because this disclosure adequately informed plaintiff of the very practices she claims were concealed and (2) claims based on the Consumer Protection Law are barred by the gist of the action doctrine.

I find no merit to the first ground because my ruling in section I of this opinion concludes that the language did not adequately explain the manner in which debit transactions and deposits are posted.

As to the second ground, PNC has not cited any case law holding that the gist of the action doctrine applies to claims based on the Consumer Protection Law. Clearly, the doctrine will not defeat Consumer Protection Law claims that arise solely from a contractual relationship between the parties when the success of the Consumer Protection Law claim is dependent upon the success of a breach of contract claim. See, e.g., 73 P.S. §201-2(4)(xiv) (failure to comply with the terms of a written guarantee or warranty). Also, the doctrine will not bar recovery for the breach of a duty grounded in contract law as modified by the Consumer Protection law. See. e.g., 73 P.S. §201-2(4)(v) (representing that goods or services have characteristics, uses, or benefits they do not have) and 73 P.S. §201-2(4)(xvi) (making repairs or improvements of an inferior nature to that agreed to in writing).

Furthermore, the gist of the action doctrine cannot defeat a claim under the catchall provision of the Consumer Protection Law (73 P.S. §201-2(4)(xxi) (engaging in any other fraudulent or deceptive conduct which creates

a likelihood of confusion or misunderstanding)). The purpose of the Consumer Protection Law is to provide additional protections to consumers beyond those provided by contract law, and a common law doctrine cannot be applied to reduce the remedies authorized by legislation. For example, a contractor installing the roof on a consumer's home may have made representations upon which the consumer relied that, in a contract action, are barred by the parol evidence rule; or the consumer may have included in the contract a limitation of damages provision which precludes the consumer, the victim of fraudulent conduct, from recovering the full amount of his or her actual losses. The purpose of the catchall provision is to provide remedies in consumer transactions that contract law will not provide. Such remedies include the award of counsel fees and actual losses which may be tripled at the discretion of the court.

## III. COMMON LAW UNCONSCIONABILITY

I am sustaining PNC's preliminary objections seeking dismissal of plaintiff's cause of action based on common law unconscionability. Under Pennsylvania case law, a finding that a provision within a contract (or the entire contract) is unconscionable will bar the party enforcing the provision (or the entire contract).[2] However, there is no Pennsylvania case law permitting a party to pursue a

---

2. For a court to find a contractual provision unconscionable, it must determine the contractual provision unreasonably favors the drafter, and there was no meaningful choice on the part of the other party regarding acceptance of the provisions. *Todd Heller, Inc. v. United Parcel Service, Inc.,* 754 A.2d 689, 700-01 (Pa. Super. 2000).

separate cause of action on the ground that the other party is enforcing an unconscionable provision in the parties' agreement. *See Salley v. Option One Mortgage Corp.,* 925 A.2d 115, 119 (Pa. 2007), where the court described the doctrine of unconscionability as a statutory and a common law defense to the enforcement of an allegedly unfair contract or contractual provision.

In the present case, unconscionability would come into play if PNC had clearly defined the term business day, and had clearly informed the customer that it posted all debit transactions at the end of a business day using a high-to-low posting sequence. Under these circumstances, in her breach of contract count, plaintiff would seek a ruling that the contractual provision permitting a high-to-low posting at the end of a business day should not be enforced against her on the ground of unconscionability.[3]

Plaintiff contends that a court should recognize a cause of action for common law unconscionability in this rare situation in which the bank holds plaintiff's money based on its unconscionable practices. Otherwise, according to plaintiff, there is no remedy.

This contention is without merit. If PNC had provided adequate notice of the use of a high-to-low posting sequence at the end of the business day, a customer may pursue a claim for breach of contract to recover overdraft fees in which the court is requested to rule that the contractual provisions upon which the bank relies to support its taking

---

3. In this opinion, I am not considering whether there would be any merit to such an argument.

of plaintiff's funds is unconscionable and unenforceable.[4]

## IV. CONVERSION

Plaintiff bases her conversion cause of action on allegations that, by improperly withdrawing overdraft fees from plaintiff's account, PNC has interfered with plaintiff's use of funds in her account without plaintiff's consent and without lawful justification.

PNC contends that this cause of action is barred by the gist of the action doctrine.[5]

In *Reardon v. Allegheny College*, 926 A.2d 477, 486-87 (Pa. Super. 2007), the scope of the gist of the action was described as follows:

The gist of the action doctrine acts to foreclose tort claims: 1) arising solely from the contractual relationship between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; and 4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim. The critical conceptual distinction between a breach of contract claim and a tort claim is that the

---

4. Plaintiff will not raise this defense in this case because of my ruling that there are no contractual provisions authorizing the use of high-to-low posting at the end of the business day.

5. The gist of the action doctrine applies to claims for conversion. *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 593 (Pa. Super. 2003); *Chapski v. Moravian at indep. Sq. Condominium Ass'n*, 2 Pa. D.&C.5th 48, 55-56 (Philla. 2007); and *Koken v. Commonwealth Prof'l Group, Inc.*, 2006 WL 334787, *1 (Phila. 2006).

former arises out of "breaches of duties imposed by mutual consensus agreements between particular individuals," while the letter arises out of "breaches of duties imposed by law as a matter of social policy." (emphasis added.) (citations omitted.)

The relationship between plaintiff and PNC was contractual. Plaintiff does not question PNC's right under the contractual relationship to withdraw overdraft fees from plaintiff's account when there has been an overdraft. The dispute is over whether the account agreement permitted PNC to calculate overdraft fees by posting all debit transactions at the end of a business day using a high-to-low posting sequence. The success of a conversion action would depend upon whether PNC was obligated to calculate overdraft fees through a method different from the method it had used in calculating plaintiff's overdraft fees.

I agree with PNC that the gist of the action doctrine bars plaintiff's conversion claim. Plaintiff voluntarily deposited money with PNC with the understanding that the rights and obligations of the parties concerning this money would be governed by the account agreement. Thus, because liability stems from the alleged breach of implied contractual duties, the success of the tort claim is dependent on the success of the breach of contract claim.

## V. UNJUST ENRICHMENT

The fifth count of plaintiff's complaint sets forth an unjust enrichment claim based on allegations that PNC

unjustly received benefits in the form of excessive and unnecessary overdraft fees, and that it would be inequitable for PNC to retain these fees.

I am sustaining PNC's preliminary objections in the nature of a demurrer as to this cause of action. Plaintiff and PNC maintain a contractual relationship. The doctrine of unjust enrichment is inapplicable where the relationship between the parties is founded upon a contract; it applies only where there is no contract. *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006).

## VI. RELIEF PURSUANT TO DECLARATORY JUDGMENTS ACT

Plaintiff alleges that PNC continues to post all debit transactions at the end of a business day, using a high-to-low posting sequence. Consequently, I am overruling PNC's preliminary objections as to count VI.

## VII. INDISPENSABLE PARTY

In its preliminary objections, PNC contends that the complaint is procedurally deficient because it fails to name an indispensable party, the joint account holder.

Plaintiff alleges that the checking account that serves as the basis for Candace Henry's cause of action was an account held jointly with her husband, David A. Henry. PNC correctly states that when a husband and a wife own a joint bank account, they hold the account as tenants by the entireties. PNC next contends that when property is owned by a husband and wife as tenants by the entireties,

both are indispensable parties to any action involving the joint bank account.

The case law does not support PNC's contention that plaintiff's husband must be joined. In *Miller v. Benjamin Coal Co.,* 625 A.2d 66 (Pa. Super. 1993), a truck owned by a husband and wife was damaged in a traffic accident. The husband sued the other driver to recover the full amount of the property damage. The trial court denied the other driver's request for a directed verdict on the ground that the wife was an indispensable party who had not been joined, and a verdict was entered in favor of the husband.

On appeal, the Pennsylvania Superior Court rejected the other driver's contention that the wife was an indispensable party. The court stated:

> [w]here a marriage continues to exist, however, we perceive no reason for holding that one spouse cannot act as agent for the entireties estate in bringing an action to recover damages for injury to the entireties property so long as the action benefits both spouses and there is no evidence rebutting the presumption of authority to act.

*Id.* at 68.

## VIII. OTHER LITIGATION

I will briefly discuss litigation in other courts addressing claims of bank customers arising out of the practice of other banks of calculating overdraft fees in generally the same manner as PNC. I have not relied on these cases for

several reasons:

My rulings are based on my reading of the specific language used in the PNC documents. Differences in language can result in different outcomes.

Pennsylvania case law is well settled as to the applicability of the implied covenant of good faith and fair dealing, the uses of the unconscionability doctrine and the gist of the action doctrine.

There are differences between the Pennsylvania Consumer Protection Law and the consumer protection laws of other jurisdictions that may produce different results in litigation challenging overdraft fees.

PNC relies on *Hassler v. Sovereign Bank*, 644 F.Supp.2d 509 (D.N.J. 2009), a class action in which the plaintiff challenged Sovereign Bank's practice of processing its customers' debit transactions by using a high-to-low sequence instead of processing these transactions in the order in which the transactions occurred.

The plaintiff raised three claims: breach of contract based on a breach of the covenant of good faith and fair dealing; unjust enrichment; and violation of a New Jersey consumer protection law. These claims were dismissed pursuant to a motion to dismiss filed by the bank.

The basis for the dismissal was the trial judge's finding that the account agreement expressly provided, in clear language that included the use of bold print, that Sovereign posts payment transactions each business day

in descending order, starting with the largest. The court stated that it would be difficult for Sovereign to disclose its practice in clearer or more understandable terms. *Id.* at 515.

The other three cases of which I am aware are relied on by plaintiff.

In *Gutierrez v. Wells Fargo Bank*, 730 F.Supp.2d 1080-82 (N.D. Cal. 2010), consumers brought a class action against Wells Fargo based on a high-to-low sequencing practice that transformed one overdraft into as many as ten overdrafts-ten being the voluntary limit the bank had imposed.

Following a bench trial, the court issued an injunction, ordering Wells Fargo to cease its practice of posting debit card transactions from high to low, and awarded restitution of close to $203 million to restore to the class overdraft fees wrongfully extracted by Wells Fargo. *Id.* at 1140.

The trial judge made the following findings:

The bank's disclosures did not articulate that the bank had already adopted a high-to-low practice; the disclosures upon which the bank relied were buried in a single-spaced writing of over sixty pages in tiny, ten-point font; no reasonable depositor could be expected to read the entire agreement or locate the disclosure; the length and complexity of the agreement made it completely unrealistic to assume that many consumers would actually read those lengthy documents; if consumers read the agreement, few would actually understand the posting

process because it was not clearly explained; when a customer complained about overdraft fees, Wells Fargo would send a response letter containing straightforward language explaining the actual posting order used by the bank, which further amplified the great lengths the bank undertook to burry the words deep in a lengthy fine-print document and to ensure the words selected were too vague to warn the depositor. *Id.* at 1113-15.

The court considered the California Business and Professions Code which prohibits business acts or practices that are unlawful, unfair, or fraudulent and ruled this legislation bars a bank from using an established practice of maximizing the number of returned checks for the sale purpose of increasing the amount of check fees-it has a duty to act in good faith. *Id.* at 1121, 1127.

The court said that where the contract confers on one party discretionary power of protecting the rights of the other, there is a duty imposed to exercise that discretion in good faith in accordance with fair dealings. Express grants of discretion are subject to the reasonable expectations of the parties. Customers do not reasonably expect that they will have to pay up to ten overdraft fees when only one would ordinarily be incurred. Id at 1122.

According to the court, to establish liability under the fraud provisions of the California Business and Professional Code, it is necessary only to show that members of the public are likely to be deceived. Unlike common law fraud, it is not necessary for the plaintiff to prove a fraudulent deception. The question is what would

be the likely effect of such a practice on a reasonable consumer. *Id.* at 1126-27.

In the next case, *In re Checking Account Overdraft litigation*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010). the plaintiffs were current or former checking account customers of several banks who sought to recover (for themselves and all other customers similarly situated) excessive overdraft fees charged to their accounts on debit card transactions. The common nucleus of fact concerned the banks' practice of reordering debits from the plaintiffs' accounts and posting any charges from the largest to the smallest, thus, maximizing overdraft fee revenue. *Id.* at 1307.

The plaintiffs filed breach of contract claims alleging breach of the implied covenants of good faith and fair dealing. The defendants sought dismissal on the ground that the implied covenant cannot vary express contractual terms. The plaintiffs' response, with which the court agreed, was that they were not seeking to vary the language of the contract but, rather, to have the express contractual terms carried out in good faith. The plaintiffs' claim was simply that the ordering of debit transactions must be carried out in a manner consistent with the covenant of good faith and fair dealing. When a party is given discretion to act under a contract, discretion must be exercised in good faith. *Id.* at 1314-15.

The complaints included a count for unconscionability based on the reordering of the debit postings in bad faith so as to maximize the number of overdraft charges. The banks

contended that unconscionability is not an affirmative cause of action; rather, case law empowers a court addressing allegations of unconscionability to do no more than refuse enforcement of the unconscionable section or sections of the contract. The plaintiff's contended that courts can utilize equitable powers to issue a declaratory decree that the contractual terms and practices are unconscionable and to award damages for the bank's past enforcement of the terms. *Id.* at 1318.

The court agreed with the plaintiffs, stating that if the overdraft provisions are found to be unconscionable, the court retains authority and discretion to fashion appropriate equitable relief. This cause of action should be recognized where the customer never had the opportunity to raise unconscionability as a defense for withholding payment; the only opportunity to raise unconscionability is through a lawsuit filed by the customer after payment has been made. *Id.* at 1318-19.

The court permitted an unjust enrichment claim to be raised contingent upon a finding that an express contract does not exist. *Id.* at 1321-22.

The court permitted the plaintiffs to pursue the tort of conversion. The court stated that the plaintiffs unquestionably had the right to possess the funds in their bank accounts upon demand to the bank, and the plaintiffs were deprived of that right because the defendant wrongfully took the funds. A conversion action may be based on this interference with the plaintiffs' property interest in the funds. *id.* at 1322-23.

In *White v. Wachovia Bank*, 563 F. Supp. 2d 1358, 1360-61 (N.D. Ga. 2008), the plaintiffs opened a joint checking account with Wachovia and executed a standard deposit agreement. The plaintiffs alleged that Wachovia routinely enforces a policy whereby charges are posted in the order of largest to the smallest amounts, even where larger charges are received days after smaller charges.

The plaintiffs raised a breach of contract claim based on the implied covenant of good faith. The court allowed this claim to proceed because the language of the agreement did not, by its express terms, grant the bank absolute or uncontrolled discretion in exercising its contractual rights. *Id.* at 1363-66.

The court also ruled that the complaint set forth a plausible claim under a Georgia consumer protection law. The court concluded that if the plaintiffs' allegations are true that Wachovia charges consumers for insufficient funds in connection with transactions for which the account had sufficient funds-this practice comes within the provisions of the law forbidding any unfair or deceptive acts or practices in the conduct of consumer transactions. *Id.* at 1369-70.

The court permitted the conversion cause of action to go forward because of allegations that Wachovia imposed overdraft fees when there was, in fact, no overdraft, and, furthermore, refused to return the funds upon demand by the plaintiffs. *Id.* at 1371.

The court dismissed the unjust enrichment claim

because there was a legal contract covering Wachovia's posting of transactions and the imposition of overdraft fees.

The court dismissed the unconscionability claim stating that the plaintiffs' argument in support of this claim is in tension with their argument, which the court found to be persuasive, that Wachovia breached its duty of good faith and fair dealing. Furthermore, because of Georgia legislation allowing items to be charged in any order, there cannot be substantive unconscionability.

For these reasons, I enter the following order of court:

## ORDER OF COURT

On this 31st day of January, 2012, upon consideration of defendant's preliminary objections seeking dismissal of each count of plaintiff's six-count amended complaint, it is ordered that plaintiff's unconscionability, conversion, and unjust enrichment counts are dismissed and defendant's preliminary objections are otherwise overruled.

A status conference will be held on February 14, 2012 at noon.