Daniel Y. GATI, Appellee

v.

**UNIVERSITY OF PITTSBURGH OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 30, 2014.

Filed May 8, 2014.

Reargument Denied June 24, 2014.

Pamela W. Connelly, Pittsburgh, for appellant.

Richard B. Sandow, Pittsburgh, for appellee.

BEFORE: BOWES, WECHT and STABILE, JJ.

OPINION BY STABILE, J.:

■ Appellant, the University of Pittsburgh of the Commonwealth System of Higher Education, appeals from the trial court's orders of May 23 and June 27, 2013.[1] Appellant asks us to review the propriety of the trial court's May 23, 2013 preliminary injunction prohibiting Appellant from dismissing Appellee, Daniel Y. Gati, from the University of Pittsburgh School of Dental Medicine ("SDM")[2] and requiring SDM to graduate Appellee on time unless otherwise permitted by the court. Further, Appellant asks us to review the trial court's June 27, 2013 order denying Appellant's emergency petition for relief from the May 23, 2013 injunction. For the following reasons, we vacate the May 23, 2013 and June 27, 2013 orders.[3]

This dispute arose during Appellee's fifth year as a student in the SDM.[4] In July of 2012, Appellee performed a root canal on Lawrence Wright ("Wright"). N.T., Preliminary Injunction Hearing, 5/14/13, at 31, 54. Appellee explained the procedure to Wright and Wright verbally consented to the treatment, but he did not sign the requisite informed consent docu-

---

1. Appellant filed separate appeals, which we have consolidated.

2. This opinion will refer to the Appellant as the SDM.

3. Appellee argues that the entire appeal is moot, inasmuch as he has received his degree and is now serving a residency. Appellee's argument misses the mark, as the order before us is merely a preliminary injunction. The parties have not stipulated that the decision on the preliminary injunction would constitute a decision on the merits.
Furthermore, the SDM asserted at oral argument that if the preliminary injunction was vacated that it would act to revoke Appellee's degree. In this appeal, we go no further than to vacate the preliminary injunction and the

order refusing to modify that injunction. It remains to be determined whether Appellee is entitled to permanent injunctive relief. Nothing in our decision precludes SDM from taking whatever action may be available to it at law or equity prior to the conclusion of Appellee's case. If SDM chooses to take any such action, nothing herein likewise precludes Appellee from challenging that action. In light of the foregoing, we decline Appellee's invitation to dismiss this appeal as moot.

4. Appellee's career at the SDM was prolonged due to an illness he suffered during his first year. N.T., 5/14/13, at 54. He was set to graduate at the end of the Spring 2013 semester. Id.

ment. *Id.* Thereafter, Appellee contacted Wright on several occasions to ask him to sign the consent form. *Id.* At 41; Plaintiff's Hearing Exhibit 1, at ¶¶ 8–9. Nonetheless, the form remained unsigned as Wright persistently cancelled and rescheduled appointments. *Id.* On January 15, 2013, Appellee spoke with Wright by telephone and obtained Wright's permission to sign the consent form on his behalf. Plaintiff's Hearing Exhibit 1, at ¶¶ 10–11. According to Dr. Kurt F. Summersgill ("Summersgill"), Associate Professor at the SDM, signing a document on a patient's behalf with the patient's consent is a violation of SDM policy, but the SDM permits it on occasion because "it's a minor infraction where no one is harmed." N.T., 5/14/13, at 244–45. Appellee informed no one that he had signed the consent form on Wright's behalf.

Several days after Appellee signed the consent form for Wright, Appellee was summoned to a meeting with Dr. Marnie Oakley ("Dr. Oakley"), Associate Dean of the SDM. N.T., Preliminary Injunction Hearing, 5/15/13, at 73. A quality care specialist brought the consent form to Dr. Oakley's attention because SDM records indicated that Wright cancelled his dental appointment on the day the form was signed. *Id.* at 83. At the meeting, Dr. Oakley confronted Appellee with records evincing that Wright cancelled his January 15, 2013 appointment because he had the flu. *Id.* at 76. Dr. Oakley asked Appellee why Wright would come in to sign a consent form on the same day Wright cancelled a dental appointment due to illness. *Id.* at 80. Appellee stated that Wright came to the SDM and signed the consent form that day because Wright knew it was important to Appellee. *Id.* at 80, 82. Ap-

pellee also told Dr. Oakley that Wright came in and signed the document at 11:00 or 11:30 a.m. on January 15. *Id.* at 83. In response, Dr. Oakley informed Appellee that the consent form was signed after 1:00 p.m. *Id.* at 81, 83. Nevertheless, Appellee continued to maintain that Wright personally signed the document. *Id.* at 83. Finally, Dr. Oakley confronted Appellee with other documents signed by Wright. *Id.* at 84. Wright's signatures were consistent except for the signature on the January 15, 2013 consent form. *Id.* at 84, 86–87. In response, Appellee then admitted that he signed Wright's name on the form. *Id.* at 87. Dr. Oakley testified that Appellee lied to her more than six times before he finally admitted that he signed the document. *Id.* at 83. Appellee testified that he was unnerved by the meeting, that Dr. Oakley was hostile, and that he initially misspoke. N.T., 5/14/13, at 84.

Subsequently, Dr. Oakley issued a student violation notice, dated January 18, 2013, documenting Appellee's dishonesty during their meeting. Defendant's Hearing Exhibits H16 and H17. The record further reveals that Appellee had a history of disciplinary and academic troubles at the SDM. On October 23, 2012, the SDM Student Promotions Committee[5] ("the Committee") issued a letter to Appellee on the subject of his "unacceptable professional behavior." Defendant's Hearing Exhibit B. The letter referred to prior concerns and warnings about Appellee's "clinical skills and unacceptable professional behavior," and stated that "any additional substantiated report of violation of the policies of the School of Dental Medicine, as outlined in the Student Handbook [ ... ] will result in a recommendation by this Committee for dismissal from the

---

5. The Student Promotions Committee "monitors and oversees the academic progress of the School of Dental Medicine Students."

Motion for Relief From Preliminary Injunction Order, 6/26/13, Exhibit A.

School of Dental Medicine." *Id.* (emphasis in original).

After the Student Promotions Committee received and reviewed Dr. Oakley's student violation notice, the Committee notified Appellee, in a January 23, 2013 letter authored by Summersgill, of its recommendation that Appellee be dismissed from the SDM. Plaintiff's Hearing Exhibit 3. The letter accused Appellee of forging a patient consent form. *Id.* In addition, the January 23 letter informed Appellee that he would have the opportunity to appear before the Committee and appeal its recommendation. *Id.* At his appeal, Appellee established that Wright authorized him to sign the consent form on Wright's behalf. Plaintiff's Hearing Exhibit 5. In a letter of February 12, 2013, the Committee informed Appellee of its unanimous decision to uphold its decision to dismiss Appellee from the SDM. *Id.* The Committee conceded that Appellee did not commit forgery, inasmuch as he signed Wright's name with Wright's permission. *Id.* at ¶ 1.b. Nonetheless, the Committee faulted Appellee for failing to note in the record that he signed Wright's name on Wright's behalf, and for repeatedly lying to Dr. Oakley. *Id.* at ¶¶ 1.b. and 1.c.

Appellee appealed the Committee's decision to Dean Thomas W. Braun ("Dean Braun"), arguing that the Committee improperly changed its justification for dismissing him after he established that he had Wright's permission to sign the consent form. Plaintiff's Hearing Exhibit 6. Dean Braun upheld Appellee's dismissal in a letter dated February 25, 2013. Plaintiff's Hearing Exhibit 7.

Having exhausted his remedies within the SDM, Appellee commenced this action on March 15, 2013 with a complaint in equity and an accompanying motion for a preliminary injunction. In both documents, Appellee alleged that the SDM breached its contract with Appellee and committed a violation of due process. Complaint in Equity, 3/15/13, at ¶ 29; Motion for Preliminary Injunction, 3/15/13, at ¶ 13.[6] With regard to the contract claim, Appellee alleged that the SDM breached the agreement "formed by [Appellee's] payment of tuition." Motion for Emergency Preliminary Injunction, 3/15/13, at ¶ 13. Appellee testified that he incurred approximately $400,000.00 in tuition and living expenses during his five years at the SDM. N.T., 5/14/13, at 95. Appellee also alleged the SDM denied him due process of law because it exonerated him on the forgery charge but dismissed him anyways on other grounds. Motion for Emergency Preliminary Injunction, 3/15/13, at ¶ 13.

In response to the lawsuit, Dean Braun, in a letter dated March 18, 2013, reinstated Appellee and instructed the Committee to reconsider Appellee's case. Plaintiff's Hearing Exhibit 8. As a result, the trial court postponed the hearing on Appellee's injunction, which the court had scheduled for March 21, 2013. Upon reconsideration of Appellee's case, the Committee once again recommended Appellee's dismissal, in a letter of April 12, 2013. Plaintiff's Hearing Exhibit 10. On May 9, 2013, the Committee denied Appellee's appeal of that decision. Plaintiff's Hearing Exhibit 13. Appellee did not appeal the Committee's decision to Dean Braun. Rather, he proceeded to the preliminary injunction hearing before the trial court on May 14 and 15, 2013.

On May 23, 2013, the trial court entered the first of the two orders on appeal. That

---

**6.** The trial court found no merit in Appellee's allegations of discrimination and Appellee has not disputed that finding in this appeal. We therefore have no occasion to address the issue.

order enjoined the SDM from dismissing Appellee for any of the reasons set forth in its various dismissal letters. Order, 5/23/13, at ¶ 1 Further, the trial court required the SDM to issue Appellee his diploma by June 30, 2013 so long as Appellee "diligently completes all clinic dental procedures reasonably made available to him by [the SDM] between the date of this [o]rder and June 30, 2013, due to the [SDM's] wrongdoing in improperly depriving [Appellee] of two (2) months of course work." *Id.* at ¶ 3. The May 23, 2013 order prohibited the SDM from denying Appellee his diploma without court approval. *Id.* at ¶ 2. The SDM filed a timely appeal from that order on June 4, 2013. Subsequently, the SDM filed a motion for a suspension of the injunction pending appeal. The trial court denied that motion on June 18, 2013. The SDM filed a similar motion in this Court, which we denied on June 27, 2013.

On June 26, 2013, as Appellee's graduation was approaching, the SDM filed in the trial court a motion for emergency relief from the trial court's May 23 preliminary injunction. The June 26 motion was the SDM's request for court approval not to graduate Appellee on time, as required by the trial court's May 23, 2013 injunction. Motion for Emergency Relief from Preliminary Injunction Order, at ¶ 2. The motion alleged that Appellee failed to complete numerous graduation requirements, despite having access to the SDM. *Id.* at ¶¶ 4, 6, 7. The motion further alleged that Appellee could not complete the necessary requirements by June 30, 2013. *Id.* at ¶ 8. The motion attached an affidavit from Dr.

Jean O'Donnell ("O'Donnell"), Associate Dean of Academic Affairs at the SDM. *Id.* at Exhibit A. The affidavit states that various SDM faculty members reacted with "outrage" at being forced to assign Appellee grades he did not earn so that he could graduate on time. *Id.* at Exhibit A, ¶ 6. In some instances, SDM administration forced faculty to assign a passing grade where Appellee otherwise would have received a grade of incomplete. *Id.*[7] In one instance, Appellee was assigned a passing grade in a course he was failing due to poor academic performance. *Id.* at Exhibit A, ¶ 7.

After a telephone conference argument,[8] the trial court denied the SDM's emergency motion on June 27, 2013. The trial court reasoned that Appellee should graduate because he had passed the dental boards and that the SDM was to blame for Appellee's incomplete coursework. Trial Court Opinion, 8/1/13, at 2–3. The trial court also concluded that the SDM was offering the same arguments it offered in opposing the May 23, 2013 order. *Id.* The SDM filed a timely appeal of the June 27 order on July 23, 2013. Appellee received his diploma from the SDM on June 30, 2013 and is currently serving a residency in New York.

■ On appeal, the SDM argues that Appellee failed to establish several of the essential prerequisites for obtaining a preliminary injunction. We begin with the applicable standard and scope of review. "On appeal from an order granting a preliminary injunction, the scope of review is

---

7. Contrary to the SDM's assertions, we do not believe that the trial court's May 23, 2013 injunction forced the school to change Appellee's grades. The SDM chose, for whatever reason, to force its faculty to change Appellee's grades before it sought relief from the injunction. The SDM could and should have

sought relief earlier, when it became apparent that Appellee's grades were not sufficient to graduate.

8. The trial judge was out of state on vacation when the SDM filed its motion for emergency relief.

narrow." *Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 392 Pa.Super. 502, 573 A.2d 575, 577 (1990), appeal denied, 527 Pa. 596, 589 A.2d 687 (1990). "In determining the propriety of the entry of an order granting a preliminary injunction, the question is whether there were any apparently reasonable grounds in the record to justify its issuance." *Id.* (quoting *Fischer v. Dep't of Pub. Welfare*, 497 Pa. 267, 439 A.2d 1172, 1174 (1982)).

On an appeal from a decree granting or denying a preliminary injunction, the appellant has a very heavy burden to overcome; such a decree will not be interfered with upon appellate review in the absence of a plain abuse of discretion by the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the Chancellor.

*Id.* (citations omitted).[9]

■ Thus, we must ascertain whether the trial court abused its discretion in determining that Appellee established all of the essential prerequisites for an injunction. *Id.* at 577–78. The prerequisites are as follows:

First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity. Sixth, and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

*Summit Towne Ctr. v. Shoe Show of Rocky Mount, Inc.*, 573 Pa. 637, 828 A.2d 995, 1001 (2003) (citations omitted). The

---

**9.** The parties dispute whether the trial court's injunction was prohibitive or mandatory. We have described the distinction as follows:

Generally, preliminary injunctions are preventive in nature and are designed to maintain the *status quo* until the rights of the parties are finally determined. There is, however, a distinction between mandatory injunctions, which command the performance of some positive act to preserve the *status quo*, and prohibitory injunctions, which enjoin the doing of an act that will change the *status quo*. This Court has engaged in greater scrutiny of mandatory injunctions and has often stated that they should be issued more sparingly than injunctions that are merely prohibitory. Thus, in reviewing the grant of a mandatory

injunction, we have insisted that a clear right to relief in the plaintiff be established. *Overland Enter., Inc. v. Gladstone Partners, LP*, 950 A.2d 1015, 1019–20 (Pa.Super.2008) (*quoting Mazzie v. Commonwealth*, 495 Pa. 128, 432 A.2d 985, 988 (1981)). A mandatory injunction is an "extraordinary" remedy that "should be utilized only in the rarest of cases." *Id.* at 1019. The order on appeal arguably has elements of both. The trial court prevented the SDM from dismissing Appellee, but also mandated that the SDM graduate him on time in order to prevent the SDM from retaliating against Appellee. In the main text, we have analyzed the trial court's order under the standard applicable to prohibitive injunctions.

party seeking the injunction must establish all of these prerequisites. *Overland,* 950 A.2d at 1020. Failure to establish any prerequisite is fatal to the injunction. *Id.*

The SDM argues, among other things, that the trial court erred in finding that Appellee had a clear right to relief.[10] SDM's Brief, 921 WDA 2013, at 455; SDM's Brief, 1182 WDA 2013, at 4–5. In support of its argument, the SDM cites authority circumscribing a court's ability to interfere with the decision making of academic institutions. The SDM also argues that Appellee failed to establish the SDM is bound by any contractual obligation. Appellee responds that the SDM was contractually bound to follow the procedures set forth in its student handbook before dismissing him. Appellee further argues that he has invested considerable time and money toward obtaining his degree, and that the SDM cannot arbitrarily deprive him of the opportunity to graduate without affording him due process. The trial court concluded the SDM violated due process and breached its contractual obligations to Appellee in dismissing him. Trial Court Opinion, 5/23/13, at 7.

Our first task is to ascertain the contours of the SDM's duty to Appellee. The United States Supreme Court has held that public schools, as state actors, must adhere to the strictures of federal proce-dural due process. *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). "The Fourteenth Amendment forbids the State to deprive any person of life, liberty, or property without due process of law." *Id.* at 572, 95 S.Ct. 729. The protection of procedural due process attaches to property interests arising from, *inter alia,* entitlements created by state statute. *Id.* The plaintiff high school students in *Goss* had a property interest in their public education because Ohio statutory law guaranteed residents free education between the ages of five and twenty-one. *Id.* at 573, 95 S.Ct. 729.

Concerning public institutions of higher learning, the Supreme Court has assumed, without deciding, that students have a constitutionally protected property right in their continued enrollment. *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 222–23, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Board of Curators of the Univ. of Mo. v. Horowitz,* 435 U.S. 78, 84–85, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).[11] The *Ewing* and *Horowitz* cases, unlike *Goss,* did not involve an express state statutory entitlement. Thus, the *Ewing* and *Horowitz* Courts relied on the assumed applicability of substantive due process, which, pursuant to the Fourteenth Amendment, protects interests deemed fundamental under the federal Constitution. The Su-

**10.** The SDM also argues Appellee did not suffer irreparable harm. We decline to decide this appeal on the presence—or lack thereof—of irreparable harm to Appellee. We would have no trouble concluding that the SDM's dismissal of Appellee for dishonesty, shortly before his graduation and after he invested five years and hundreds of thousands of dollars in his education, constitutes irreparable harm. The SDM's argument to the contrary is entirely unpersuasive in light of the circumstances of this case. If, however, the SDM's decision was justified, Appellee has suffered no harm for which he can obtain legal redress. We therefore focus our analy-sis on whether Appellee can demonstrate a clear right to relief.

**11.** The *Goss* and *Horowitz* Courts also noted that a school's action could implicate a student's liberty interest. *Goss,* 419 U.S. at 574, 95 S.Ct. 729; *Horowitz,* 435 U.S. at 84–85, 98 S.Ct. 948. The *Goss* Court noted that the Due Process Clause of the Fourteenth Amendment protects against deprivations of liberty. *Goss,* 419 U.S. at 574, 95 S.Ct. 729. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied." *Id.*

preme Court has never gone so far as to hold that a student's right to his or her continued higher education is a substantive constitutional right protected by the Fourteenth Amendment.

In the case of a dispute between a student and a private school,[12] Pennsylvania Courts apply a contract law analysis. *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa.Super.2007)(citing *Barker v. Trs. of Bryn Mawr Coll.*, 278 Pa. 121, 122 A. 220, 221 (1923)), *appeal denied*, 596 Pa. 755, 947 A.2d 738 (Pa.2008). "As such, we review the agreement between the parties concerning disciplinary procedures, con-

tained within a portion of the student handbook [ ... ] as we would any other agreement between two private parties." *Id.* The *Reardon* opinion does not indicate that the defendant school disputed the existence of a contractual obligation based on the handbook. This Court concluded that the school afforded the student the rights promised to her in the student handbook, and therefore affirmed the dismissal of her breach of contract claim. *Id.* at 482. "Our review of the record indicates appellant was afforded the rights promised to her in the [handbook]. That is all that was required." *Id.* The *Reardon* Court disa-

---

**12.** Here, we must briefly address the status of the University of Pittsburgh. The parties largely avoided this issue in their briefs. The University of Pittsburgh, of which the SDM is a part, is a state-related institution pursuant to the University of Pittsburgh—Commonwealth Act ("Act"), 24 P.S. §§ 2510–201–211. As such, it is an "instrumentality of the Commonwealth." 24 P.S. § 2510–202(6). Likewise, the University of Pittsburgh receives state appropriations to expend for maintenance and for supplementing the tuition of students who are full-time Pennsylvania residents. 24 P.S. § 2510–206. The University of Pittsburgh Board of Trustees comprises thirty-six members, twelve of which are Commonwealth appointees. 24 P.S. § 2510–204. Nonetheless, the Act provides for the University of Pittsburgh to continue its prior corporate existence unchanged except where specified in the Act. 24 P.S. § 2510–203.

The Pennsylvania Supreme Court, in *Mooney v. Temple University*, 448 Pa. 424, 292 A.2d 395 (1972), analyzed the Temple University—Commonwealth Act, 24 P.S. § 2510–1–12, which is substantively very similar to the University of Pittsburgh Act. The Supreme Court held that the Temple Act did not render Temple a state agency as that term is defined in the Inspection and Copying Records Act, 65 P.S. § 66.1 *et. seq. Id.* at 398–401.

On the other hand, the Third Circuit has treated the University of Pittsburgh as a state actor in several cases. In *Krynicky v. University of Pittsburgh*, 742 F.2d 94, 103 (3d Cir. 1984), *cert. denied*, 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985), the Third Circuit held that the Act rendered the school a

state actor for purposes of 42 U.S.C.A. § 1983. That is, the Act created a symbiotic relationship between the school and the state such that the school acted under color of state law in denying tenure to a professor. *Id.* at 96, 103; *see also, Braden v. Univ. of Pittsburgh*, 552 F.2d 948 (3d Cir.1977).

In a single paragraph, the SDM asserts that, as a state-related public institution, its handbook does not form a contract with its students. Appellant's Brief at 40 (*citing Tran v. State Sys. of Higher Ed.*, 986 A.2d 179, 183 (Pa.Commw.2009)). West Chester University, the defendant in *Tran*, is part of the State System of Higher Education, pursuant to 24 P.S. § 20–2002–A, and therefore is a Commonwealth agency. *Id.* at 183–84. Since the University of Pittsburgh is a state-related school, *Tran* is inapposite. Moreover, if the SDM was correct in its reliance on *Tran*, it arguably should have filed this appeal in the Commonwealth Court.

In any event, we are without the benefit of detailed briefing and argument on whether we should treat the University of Pittsburgh as public or private. In this case, as we will demonstrate in the main text, the SDM's status as either public or private would not alter the outcome of this appeal. We therefore express no opinion on whether the University of Pittsburgh, and by extension the SDM, is a public or private school for purposes of our analysis. We observe, however, that the University of Pittsburgh should not expect to use its unique state-related status to avoid any obligation to its students under either due process or contract law.

vowed any reliance on concepts of due process or fundamental fairness. *Id.* at 481 n. 1 (*citing Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418 (2001)).

Likewise, in *Swartley v. Hoffner,* 734 A.2d 915 (Pa.Super.1999), this Court wrote that "the relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract." *Id.* at 919. "The contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." *Id.*

Both parties cite *Boehm,* in which two students of the University of Pennsylvania School of Veterinary Medicine [13] were suspended for conduct "compatible with cheating" on an examination. *Boehm,* 573 A.2d at 577. The school notified the students of the charges, and found them guilty after a hearing. *Id.* The hearing was lengthy, and the students were able to confront the witnesses against them with the assistance of a faculty advisor. *Id.* at 582. Subsequently, the dean suspended the students and an appeals committee upheld the dean's decision. *Id.* at 577.

The *Boehm* Court noted, "[t]he general rule [ ... ] has been that where a private university or college establishes procedures for the suspension or expulsion of its students, substantial compliance with those established procedures must be had before a student can be suspended or expelled." *Id.* at 579. Further, the Court noted that courts are occasionally willing to review

the rules and regulations of private colleges to ensure that they "comport with basic notions of due process and fundamental fairness." *Id.* at 580. Subsequently, as noted above, the *Reardon* Court declined to import concepts of fundamental fairness into the analysis. Ultimately, the *Boehm* Court concluded the defendant school adhered to its published code of rights and afforded the student a fundamentally fair hearing that complied with the mandates of due process. *Id.* at 582.

■■■ In any event, "the right of a student to attend a public or private college or university is subject to the condition that he comply with its scholastic and disciplinary requirements[.]" *Boehm,* 573 A.2d at 578. Said another way, the essence of the bargain between student and university is as follows: "A student has a reasonable expectation based on statements of policy by [the school] and the experience of former students that if he performs the required work in a satisfactory manner and pays his fees he will receive the degree he seeks." *Ross v. Penn. State Univ.,* 445 F.Supp. 147, 152 (M.D.Pa.1978).

Schools have broad discretion to implement and enforce academic and disciplinary rules and regulations. *Boehm,* 573 A.2d at 578. Courts do not interfere in a school's academic and disciplinary decision-making absent an abuse of discretion. *Id.* Concerning court review of disciplinary proceedings, this Court has written: "The courts have been very reluctant to interfere with college proceedings concerning internal discipline." *Schulman v. Franklin & Marshall Coll.,* 371 Pa.Super. 345, 538 A.2d 49, 52 (1988) (*en banc*). "A college is a unique institution which, to the degree possible, must be self-governing

---

**13.** We noted that the students failed to plead or prove that the defendant school received any public money. *Id.* at 578 n. 1.

and the courts should not become involved in that process unless the process has been found to be biased, prejudicial or lacking in due process." *Id.*[14] In the case of a purely academic decision, courts must "show great respect for the faculty's professional judgment." *Swartley*, 734 A.2d at 921 (quoting *Ewing*, 474 U.S. at 225, 106 S.Ct. 507). "Plainly, they may not override [the school's judgment] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.*[15]

■ With these principles in mind, we turn to the facts of the present case. The SDM's Student Handbook authorizes dismissal of a student for, among other things, "Unacceptable professional behavior as established by the written policy of the SDM." University of Pittsburgh School of Dental Medicine Student Handbook, 2008–2009, Plaintiff's Hearing Exhibit 2, at 38. The SDM relied on several portions of the Student Handbook in support of its decision to dismiss Appellee. For example, the Student Handbook incorporates a dental oath, which provides that, among other things, students must "uphold the dignity, honor, and objectives of the dental profession" and "faithfully observe the principles of ethics set forth by the profession[.]" *Id.* at 2. The Student Handbook also includes a section titled "Guidelines on Academic Integrity," which provides that each student has "an obligation to exhibit

---

**14.** This Court's opinion in *Reardon* is somewhat in tension with our earlier opinion in *Boehm* and our *en banc* opinion in *Schulman* regarding the extent to which we will incorporate due process concepts into our analysis of a contractual dispute between a student and a private school. *Reardon* relied on our Supreme Court's opinion in *Murphy*, but the dispute in *Murphy*, as the *Reardon* Court acknowledged, arose from an employment contract between a private university and a professor. *See Reardon*, 926 A.2d at 480 n. 2. Student handbook cases are unique in that the handbooks are not the subject of negotiation between the student and the school and the school typically retains the authority to revise the handbook at any time. It is therefore not clear that *Murphy* impliedly overruled *Boehm* or *Schulman*. Given the circumstances of this case and our ultimate disposition, resolution of the apparent tension in our prior case law is beyond the scope of this opinion.

**15.** The parties dispute whether the SDM's decision to dismiss Appellee was academic or disciplinary. While academic institutions have broad discretion in both contexts, courts have shown a greater reluctance to intervene in a purely academic decision:

> University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation. Thus, we must determine whether a decision to fail a student was rational and had a reasonable basis in fact in order to determine if impermissible factors were operative. More specifically, we must review the case in order to determine whether there is no rational basis for the university's decision or [whether] the decision ... was motivated by bad faith or ill will unrelated to academic performance.

*Swartley*, 734 A.2d at 921 (internal citations and quotation marks omitted).

The SDM argues that ethics and honesty are deeply intertwined in the school's academic curriculum. We are sympathetic to the argument that the distinction between academic and disciplinary decision-making is less than clear in this case. The trial court's injunction not only forbade the SDM to dismiss Appellee, it ordered the SDM to graduate him on time unless the court permitted otherwise. Nonetheless, we view the underlying infraction—lying to faculty—as a matter of discipline. The order directing the SDM to graduate Appellee on time, however, plainly interfered with the SDM's academic decision-making authority. Ultimately, we conclude the trial court improperly interfered with the SDM's disciplinary authority. The underlying infraction here is Appellee's dishonesty in a closed-door meeting with faculty. The injunction was improper regardless of its directive to graduate Appellee on time.

honesty and to respect the ethical standards of the profession in carrying out his or her academic assignments." *Id.* at 15.[16] This section also prohibits violation of the Principles of Ethics and Code of Professional Conduct of the American Dental Association, one of which is the principle of veracity. *Id.* at 16.[17] Likewise, the Student Handbook Honor Code Statement provides that SDM students are honor bound to refrain from "falsifying data or reports" and "lying under oath." *Id.* at 27.

Procedurally, the SDM acted in accord with its Protocol For Grading and Promotion of First Professional Dental Students. *Id.* at 34. The Committee administers this protocol: "The responsibility of the Student Promotions Committee is to monitor students as to their progress in the first professional program, and ultimately, to determine whether or not the student meets the standards necessary for the practice of Dental Medicine." *Id.* The Committee has the authority to place a student on academic warning, academic probation, to suspend a student, and to dismiss a student. *Id.* at 35–37. Dismissal is "immediate release from the School of Dental Medicine." *Id.* at 37.

The Committee must inform a student in writing of its decision to dismiss. *Id.* at 38. Students have a right to appear before the Committee to contest the dismissal. *Id.* at 40. Further, the student can appeal to the Dean after the hearing in front of the Committee. *Id.* Students have

the following rights before the Committee and the Dean:

> The student has the right to present arguments in his or her defense at both levels. Extramural counsel will not be permitted. The student has the right to request the presence of a faculty representative of his or her choice from within the University Community who agrees to assist the student, but is not a member of the Student Promotions Committee at the appeals meeting. The role of the representative is to assist the student.

*Id.* Furthermore, a student who believes that he or she has not been afforded due process may request the Office of Academic Affairs to review the Committee's action. *Id.* at 41–42.

As described above, Dr. Oakley issued a January 18, 2013 violation notice to Appellee after she confronted him about Wright's signature. Based on that violation notice and an October 23, 2012 letter informing Appellee that any additional infractions would result in his dismissal from the SDM, the Committee informed Appellee on January 23, 2013 of its decision to dismiss Appellee from the SDM for forging Wright's signature. The Committee afforded Appellee an opportunity to challenge the dismissal, and Appellee appeared before the Committee and successfully established that he signed Wright's name with Wright's permission. Nonetheless, the Committee upheld Appellee's dismissal based on his failure to note in the record

---

**16.** Section II of the Guidelines on Academic Integrity sets forth the procedures for adjudication of a suspected violation. *Id.* at 16–20. Section II of the Guidelines elaborates in detail the procedure to be followed before the Academic Integrity Hearing Board. *Id.* As set forth in the main text, Appellee's proceeding took place before the Committee. The SDM did not proceed under Section II of the Guidelines on Academic Integrity, and Appel-

lee offers no argument that the school should have so proceeded.

**17.** Page 16 of the Student Handbook cites the website of the American Dental Association, www.ada.org. The ADA principles of ethics—including the principle of veracity—are set forth on the ADA website, and not in the Student Handbook.

that he signed with Wright's consent and based on his persistent dishonesty in his meeting with Dr. Oakley. Appellee appealed to Dean Braun, who upheld the Committee's dismissal.

In response to Appellee's commencement of this litigation, Dean Braun asked the Committee to revisit its dismissal decision. Thereafter, the process began anew. The Committee issued a new dismissal notice on April 12, 2013, this time including Appellee's dishonesty in the Dr. Oakley meeting as a basis for Appellee's dismissal. The Committee relied on several provisions included in or incorporated by the SDM Student Handbook. Plaintiff's Hearing Exhibit 10. In particular, the Committee relied on the Dental Oath, which provides that DSM students "will faithfully observe the principles of ethics set forth by the profession." *Id.* at 1. Likewise, the Committee cited the SDM Honor Code, which prohibits "falsifying data or reports" and requires students to "cooperate in the investigation or disposition of any allegation of violations of the Honor Code." *Id.* The Committee also relied on the American Dental Association principle of veracity. *Id.*

The Committee further explained: "There is a long documented history of counseling and warnings about your academic abilities, your clinical skills, your adherence to clinic policies, and your ethics." *Id.* The Committee cited fourteen documented instances in which Appellee received "counseling for clinical and/or ethical deficiencies" during his SDM career, up to and including the January 18, 2013 violation notice from Dr. Oakley. *Id.* at 2. The Committee faulted Appellee for giving the false impression that Wright personally signed the informed consent document, and for repeatedly lying to Dr. Oakley. *Id.* Appellee appealed once again, and the Committee upheld its April 12, 2013 dismissal. Appellee did not exercise his right to appeal once again to Dean Braun.

While disavowing any contractual obligation to Appellee, the SDM argues that it proceeded in accordance with established SDM procedures as set forth in the student handbook. The SDM also argues that Appellee's handling of Wright's informed consent and his dishonesty to Dr. Oakley were sufficient justifications for Appellee's dismissal from the SDM, especially in light of Appellee's past history at the SDM. Appellee counters that the SDM occasionally permits students to sign forms on behalf of patients, and that he therefore did nothing wrong. Further, he argues that he merely misspoke to Dr. Oakley, owing to his nervousness. Appellee further argues that the SDM cannot cite any written policy expressly prohibiting dishonesty to a professor unless the student is under oath.

Having conducted a thorough review of the record and applicable law, we discern no apparently reasonable grounds in support of the trial court's injunction. The SDM student handbook permits dismissal for unprofessional conduct as set forth in the SDM's written policy. As described above, several portions of the handbook, including the dental oath and the incorporation of the ADA's principles of ethics, require students to conduct themselves with integrity. We have no difficulty in concluding that Appellee's repeated dishonesty [18] in his meeting with Dr. Oakley

---

18. The trial court credited Appellee's testimony that he was "intimidated and stressed when he entered what can only be likened to a 'Star Chamber' proceeding" in front of Dr. Oakley. Trial Court Opinion, 5/23/13, at 7. The trial court also found that Wright effectively did sign the consent form by giving Appellee permission to sign for him. *Id.* We accept these findings, and we observe once again that the Committee did not find Appel-

violated the SDM's written policies as set forth in the student handbook.

Assuming a binding contract exists between the SDM and Appellee, it comprises the written policies and procedures provided to Appellee in the student handbook. *Swartley*, 734 A.2d at 919. The record reflects that the SDM complied with the procedure set forth in its student handbook. The SDM dismissed him for his dishonesty to Dr. Oakley, in addition to a host of other violations that led the SDM to issue him a last chance warning letter. In other words, Appellee's dishonesty to Dr. Oakley was a sufficient basis for dismissal under the letter of the student handbook, and the SDM followed its written procedure in arriving at its dismissal decision. Appellee has failed to establish that the SDM dismissed him on a basis not specified in the student handbook. Thus, Appellee has failed to establish a clear right to relief and the trial court, on the facts of this case, erred in interfering with the SDM's internal disciplinary decision-making.

Under a due process analysis, the same conclusion obtains. The SDM afforded Appellee notice of the charges against him and an opportunity to be heard. Appellee received an additional opportunity to be heard after he defeated the forgery charge. Appellee complains that he was not initially on notice that he could be dismissed for his dishonesty to Dr. Oakley. To the extent that the SDM denied Appellee due process in this regard, it cured its error when Dean Braun asked the Committee to revisit its dismissal decision.

Appellee's argument offers no other basis upon which this Court could conclude that he was denied due process, and the record does not reflect that Appellee asked the Office of Academic Affairs to determine whether he was denied due process, as was his right under the student handbook.

In summary, we have concluded that Appellee failed to establish a clear right to relief, and that the trial court erred in interfering with the SDM's internal disciplinary proceedings. Since we conclude that no apparently reasonable grounds support the preliminary injunction, we vacate the trial court's May 23, 2013 order. The June 27, 2013 order simply denied the SDM's request for relief from the May 23, 2013 injunction. Since we are vacating the May 23 injunction, we vacate the June 27, 2013 order as well. Finally, we remand to the trial court for litigation of the merits of Appellee's complaint in equity.

Orders vacated. Case remanded. Jurisdiction relinquished.

WECHT, J., files a Concurring Opinion.

## CONCURRING OPINION BY WECHT, J.:

I join the sound and thorough opinion of the learned majority. I write separately to note my additional view that the University of Pittsburgh School of Dental Medicine ("SDM") is entitled to revoke Appellee's Doctorate of Dental Medicine.[1]

The thrust of the majority's opinion validates the SDM's handling of this matter. Through its May 23, 2013 and June 27,

---

lee guilty of forgery. Nonetheless, the record conclusively establishes Appellee was not truthful in his repeated assertions to Dr. Oakley that Wright personally signed the consent form.

1. The majority does not decide the issue of degree revocation. The majority notes that

the SDM seeks the opportunity to revoke Appellee's degree, but suggests that such relief might be sought in connection with litigation on the merits concerning Appellee's entitlement *vel non* to permanent injunctive relief. Majority Op. at 724 n. 3.

2013 orders, the trial court forced the SDM to graduate Appellee, Appellee's academic and disciplinary disqualification notwithstanding.

A thorough review of the law and the facts applicable to this case convinces me that the trial court's actions effectively compelled the SDM to shoehorn an otherwise unqualified student into degree status. In combination, the May 23 and June 27, 2013 orders communicated emphatically that the trial court would show no tolerance of any step taken by the SDM to place any requirements in the way of Appellee's graduation, and effectively commanded the conferral of a dentist's degree upon Appellee. Anything short of a degree award presumably would have exposed the SDM to contempt proceedings.

If our law does not countenance micromanagement and intrusion by the judiciary into a university's assessment of its own academic and disciplinary requirements (provided good cause is shown and due process is afforded), then a university must be free to revoke a degree which it was improperly forced to confer and which was therefore void *ab initio*. It can hardly be disputed that the authority given to an institution of higher learning to confer a degree carries with it the concomitant authority to revoke a degree, provided the institution shows good cause and follows lawful procedure, as the majority establishes occurred in this case. *See, e.g., Waliga v. Board of Trustees of Kent State University*, 488 N.E.2d 850, 852–53, 22 Ohio St.3d 55, 57–58 (1986); *accord, Crook v. Baker*, 813 F.2d 88, 91–94 (6th Cir.1987).

For the foregoing reasons, and for the reasons ably detailed by the majority, I join in the majority's decision to vacate the May 23, 2013 and June 27, 2013 orders. Having determined that the plain effect of the trial court's actions was effectively to compel the SDM to confer a degree upon an ineligible student, I respectfully disassociate myself from comments in the majority opinion suggesting that the SDM's entitlement to revoke the degree remains an open question (*See* Majority Op. at 724 n. 3), and asserting that the SDM chose to change Appellee's grades rather than being forced to do so by the trial court. (*See id.* at 727, n. 7).[2] In all other respects, I join in the majority's fine opinion.

---

**2.** The majority discounts the SDM's claim that the trial court's May 23, 2013 injunction forced the SDM to change Appellee's grades. The majority asserts that the SDM "could and should have sought relief earlier, when it became apparent that Appellee's grades were not sufficient to graduate." Majority Op. at 727 n. 7. In fact, however, the record establishes the SDM's diligence in seeking relief.