J-A14026-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JAMES G. WAITE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CDG PROPERTIES, LLC. | : | |
| | : | |
| | : | No. 1905 MDA 2015 |
| v. | : | |
| | : | |
| | : | |
| GRANDVIEW MANAGEMENT, INC. | : | |
| AND BURNHAM FARMS, LP. | : | |
| | : | |
| Appellants | : | |
| | : | |
| STONE VALLEY CONSTRUCTION, | : | |
| INC., AND COUNTRY COVE | : | |
| CONDOMINIUM ASSOCIATION | : | |

Appeal from the Judgment Entered October 1, 2015
In the Court of Common Pleas of Centre County
Civil Division at No(s):  2013-569


BEFORE:   BOWES, OTT, and PLATT[*]

CONCURRING/DISSENTING MEMORANDUM BY OTT, J.:**FILED JANUARY 18, 2017**

I agree with the Majority's resolution of Appellants' first and third

issues.  With respect to Appellants' second issue, I do not disagree with the

Majority that injunctive relief can be a proper remedy in matters such as

this;  however,  I  believe  the  evidence  does  not  support  imposing  a

_____

[*] Retired Senior Judge assigned to the Superior Court.

mandatory injunction, where that evidence does not show how the harm can be corrected. Accordingly, I respectfully dissent from that portion of the Majority decision that affirms the trial court's issuance of an injunction.

The trial court ordered Appellants to "modify the storm water drainage system so that water is conveyed to the storm water basin as intended and no longer drains onto [Waite's] property." Opinion and Verdict, 5/20/2015, at 6. Essentially, Appellants claim there is insufficient evidence upon which to base the grant of injunctive relief and the order for relief is too vague and speculative to be obeyed. I agree.

Initially, there is a difference between a mandatory injunction and a prohibitory injunction:

> Generally, preliminary injunctions are preventive in nature and are designed to maintain the *status quo* until the rights of the parties are finally determined. There is, however, a distinction between mandatory injunctions, which command the performance of some positive act to preserve the *status quo,* and prohibitory injunctions, which enjoin the doing of an act that will change the *status quo.* This Court has engaged in greater scrutiny of mandatory injunctions and has often stated that they should be issued more sparingly than injunctions that are merely prohibitory. Thus, in reviewing the grant of a mandatory injunction, we have insisted that a clear right to relief in the plaintiff be established.
> A mandatory injunction is an "extraordinary" remedy that "should be utilized only in the rarest of cases."

***Gati v. University of Pittsburgh***, 91 A.3d 723, 728, n. 9 (Pa. Super. 2014) (citation omitted).

Further,

> An injunction is a court order that can prohibit or command virtually any type of action. It is an extraordinary remedy that should be issued with caution and "only where the rights and equity of the plaintiff are clear and free from doubt, and where the harm to be remedied is great and irreparable." 15 Standard Pennsylvania Practice 2d, § 83:2 (2005). The required elements of injunctive relief are: a clear right to relief; an urgent necessity to avoid an injury that cannot be compensated in damages; and a finding that greater injury will result from refusing, rather than granting, the relief requested. *Id*. at § 83:19. Even where the essential prerequisites of an injunction are satisfied, the court must narrowly tailor its remedy to abate the injury. ***John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.***, 471 Pa. 1, 7, 369 A.2d 1164, 1167 (1977).

***Big Bass Lake Cmty. Ass'n v. Warren***, 950 A.2d 1137, 1144-45 (Pa. Cmwlth. 2008).

Because of the extraordinary nature of a mandatory injunction, requiring a clear right to relief and an urgent need to avoid further injury which cannot be compensated in damages, I believe there must, in this instance, be a greater level of evidence demonstrating the specific nature of the problem to be corrected, and the manner in which such corrections can be made, particularly since the construction company responsible for the swale was removed from the case by a directed verdict. Here, the trial court determined only that "the damage to [Waite's] trees was caused by Additional Defendants Grandview and Burnham Farms' failure to construct and maintain a properly functioning storm water drainage system[.]" **See** Opinion and Verdict, 5/20/2015 at 5. Waite argues in his Appellee's brief

- 3 -

that the injunction "merely requires the Appellant to properly correct the grade of the ditch into the retention pond"[1] to abate the problem. However, Waite fails to indicate where in the certified record this statement can be found and my review of the notes of testimony has failed to reveal the source of this statement. Paul David Dembowski,[2] the civil engineer employed by the Pennsylvania Department of Environmental Protection assigned to the development project in question, testified there was a sufficient grade to allow the storm water to flow downhill, N.T. Trial, 1/26/2015, at 90, and that the relevant improvements he mandated had been made, yet the catch basin still did not fill.

Further, another of Waite's experts, Eric Chase, a geologist, testified to the following on cross-examination:

Q [counsel for Stone Valley Construction]: Excuse me Mr. Chase, just a few questions for you. You testified that it is your opinion that the swale is not functioning effectively; is that correct?

A: Correct.

Q: There's different ways a swale cannot function correctly, or function effectively; is that correct?

A: Correct.

Q: It could be designed improperly; correct?

A: Yes.

_____

[1] Appellee's Brief, at 6-7.

[2] Mr. Dembowski was called to testify by Appellee, James Waite.

Q: It could be constructed improperly; correct?

A: Yes.

Q: It could be maintained improperly; correct?

A: Correct.

Q: You're offering no opinion whatsoever as to which of those is going on here; is that correct? There's nothing in your report…

A: There's nothing in my report.

N.T. Trial, 1/26/2015, at 129-30.

Finally, Keith Lingenfelter, an ISA certified arborist, another of Waite's experts, testified on cross-examination to the following:

Q [counsel for Stone Valley Construction]: Mr. Lingenfelter, you are not an expert in the design of drainage swales; correct?

A: No. I have landscape experience in that and that is it.

Q: You are not an expert in construction of drainage swales; correct?

A: No.

Q: And you are not an expert in the maintenance of drainage swales; correct?

A: No.

Q: So, if there is excess water getting to Mr. Waite's property, you would not be offering any opinion with regard to whether it is because of the design, construction or maintenance of the drainage swale; is that correct?

A: I could not comment on that, no.

*Id*. at 75.

The expert testimony in this matter only indicated that after the storm water drainage system was constructed, additional amounts of water made its way, underground, from Appellants' property to Waite's property, and that water killed a number of Waite's trees within three years of the construction. The experts did not measure underground water flow nor did they track the underground water flow. There is no proof how much extra water is diverted to Waite's property or if such drainage occurs after every rain or only heavier rains. The experts did not explain how or why the construction caused the drainage problem. In fact, the evidence presented at trial was insufficient to prove culpability on the part of Stone Valley Construction, the company that actually built the storm water drainage system.[3]

In the same vein, the evidence has provided no guidance to Appellants in what must be undertaken to abate the problem. This makes the trial court's order imposing a mandatory injunction too vague to obey.

Additionally, I believe the vague nature of the evidence and order distinguishes the instant matter from other relevant case law. In *Youst v. Keck's Food Service, Inc.*, 94 A.3d 1057 (Pa. Super. 2014), the evidence demonstrated,

_____

[3] Storm Valley Construction was granted a directed verdict on the basis there was no evidence the swale had been designed, constructed or maintained improperly. *See* N.T. Trial, at 184-87.

It is uncontroverted that, in 2009, Appellant drained the pond, destroyed the 100–year–old Dam, and re-banked the pond approximately 20 feet away from its prior location. *Id*. at 46. Appellant then created an artificial rock-lined bed, which changed the direction of the surface water channel. *Id*. at 44– 48. In particular, Appellant channeled the surface water away from the pond and directly into the Yousts' property through the newly installed six-foot-high by six-foot-wide drainage pipe. *Id.* Moreover, although Appellant's witness, Dr. Clay Emerson, opined that the year–2009 construction restored the area to its "natural" condition, Appellant's president and CEO testified that: "[t]he pond is actually on the lowest lying area of [Appellant's] property;" he did not know whether the pond existed before the Dam was constructed; and, he did not know the original, natural course of the channel. N.T. Trial, 8/2/12, at 90–95.

*Youst*, 94 A.3d at 1074.

In *Rau v. Wilden Acres, Inc.*, 103 A.2d 422 (Pa. Super. 1954), the evidence was similarly detailed:

[D]efendant divided its tract into lots, laid out and paved streets, graded the lots toward the streets, and constructed houses thereon; that, as a result, the surface waters drained down the streets to a point at their intersection near the mouth or funnel of the swale which was a low point in the contour of the land; that defendant, by a two-foot excavation, lowered it still more; that in order to dispose of the surface waters thus collected at that point defendant not only narrowed the mouth of the swale but cut a channel approximately 30 to 36 feet wide and 9 feet deep through a bank of earth it had previously erected across the mouth of the swale, thereby funnelling the water into a body and discharging it with greater force and in increased quantities at a particular point on plaintiff's land; that defendant also uprooted trees on its property and piled them, together with other debris, in a low spot on an undeveloped part of its own land whereby it further diverted surface water from the portion of the hollow on its own land into the portion on plaintiff's land; that prior to defendant's operations no damage was occasioned to plaintiff's land by the natural flow of surface waters and there was no interference with plaintiff's farming operations, but as a result of defendant's conduct a gulley or ditch had been washed or eroded from the artificial channel created by defendant across

its land to the uprooted trees piled in the hollow on its land, and surface water accumulating in this hollow has overflowed and washed a gulley or ditch across plaintiff's land which gutter varies in depth from 18 inches to 3 feet and in width from 5 to 16 feet, and prevents access between the separated parts of plaintiff's field and prevents him from farming a large portion of his land. In substance, therefore, what the chancellor found was that 'Defendant has diverted the natural flow of the surface water from its property onto and over [plaintiff's] field by concentrating the water at an artificial point of flow and by cutting an artificial channel, which natural flow of surface water, in the absence of these acts of defendant, would naturally be diffused and be dissipated in the main into the low point or hollow upon defendant's own premises.'

*Rau*, 103 A.2d at 424.

In ***St. Andrew's Evangelical Lutheran Church of Audobon v. Lower Providence Twp.***, 198 A.2d 860 (Pa. 1964), the evidence supporting relief was described as follows:

Prior to the installation of the pipe, surface waters flowing from the Schrack property toward the parsonage property to the south flowed over a broad front along the rear portion of the latter property. The drainage pipe causes the surface waters to flow upon the Austin property in a concentrated flow, and has increased the quantity of surface waters discharged on the Austin property. By reason of the concentrated flow of surface waters, approximately 75 percent of the back yard of the parsonage is rendered swampy and mushy. The pipe drains not only the Schrack property, but also a part of the Apple Valley Development, a near by residential development. The pipe drains property on the north side of Sparrow Road for a distance of 135 feet to the east of the north terminus of the pipe, and for a distance of 55 feet to the west of the north terminus of the pipe, and for a distance of 160 feet to the north of the terminus of the pipe. The Austins' cesspool has filled up at an accelerated pace because of this increased and concentrated flow of water. Plaintiffs had a surface water problem prior to the installation of the pipe under Sparrow Road. However, the water problems have been increased and aggravated by the installation of the

pipe. Closing of the pipe will result in flooding of the Schrack property.

*St. Andrew's*, 198 A.2d at 861.

Finally, in *Ridgeway Court, Inc. v. Landon Courts, Inc.*, 442 A.2d 246 (Pa. Super. 1981), the evidence presented demonstrated:

Following the Landon's development of their respective properties, including the removal or elimination of a high land point or knoll, part of the surface water flow was diverted away from its natural course towards Lansdowne Avenue and re-directed toward and across the northerly portion of Ridgeway's property. The Plaintiff's experts testified that the Landon's development of their land created an increase in acreage of land draining onto Ridgeway's land, increased by 13% the slope of the land, and increased the concentrated and channelled surface water run-off by 4.07 cubic feet per second.

*Ridgway*, 442 A.2d at 247.

I believe that in each of these cases where mandatory injunctive relief was ordered, that order was supported by detailed evidence suggesting a method of abatement. It is the lack of such detailed evidence I find troubling herein, and why I believe the instant order for mandatory injunctive relief should be reversed.

In light of the above, I respectfully dissent from that portion of the majority decision affirming mandatory injunctive relief.